THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE JACKSON, Defendant-Appellant.

Second District   No. 2—90—0891

Opinion filed December 3, 1992.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan, and Richard E. Zulkey, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Willie Jackson, was convicted of armed robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18—2(a)) and sentenced to 15 years' imprisonment. On appeal, he argues that the trial court erred by denying him the opportunity to impeach one identifying eyewitness with evidence that the witness had misidentified a suspect in an unrelated case.

The cause involved the armed robbery of a Domino's Pizza store in Zion. The two employees identified defendant as one of the perpetrators. Defendant presented an alibi defense. Prior to trial, the State presented a motion *in limine* to exclude evidence that Mohamed Vakili, one employee, had misidentified a man who assaulted him three weeks prior to trial. When shown photographs of suspected assailants, Vakili selected a photograph of a man who was allegedly incarcerated. The court reserved its ruling on the motion.

On November 5, 1989, a Sunday, at 4:13 p.m. Lisa Naeyaert was working as the assistant manager of a Domino's Pizza store. She was answering telephones at a counter about five feet from the door. The store was well lit. Two men walked into the store. One man was black, 5 feet 9 inches tall, weighing about 180 pounds and wearing a grey, hooded sweatshirt under a red, satiny jacket, a black cap and black-framed eyeglasses. The second man was black, 6 feet 2 inches tall, weighed about 180 pounds, wore a black T-shirt, a red, satiny jacket, and jeans, and had a slight moustache. The taller man asked to use the bathroom, but Naeyaert told him none was available and directed him across the street. The men then placed a carry-out order and left.

The same two men returned about two minutes later and stated that no rest room was available across the street and that they wanted to use the Domino's rest room. Naeyaert denied their request and turned to make some pizzas. About 30 seconds later, the taller man was at her right side in the private area of the store. He said, "Ma'am, this is a hold-up." She then saw the shorter man holding a gun at the other employee, Mohamed Vakili. The taller man tried to open the cash drawer, but it was locked. He told her to get the keys. She checked her pockets but found only her car keys. She walked into the back office, followed by the taller man. She did not see the keys, checked her pockets again, and found the key. She unlocked the drawer, and the taller man took the money. While the shorter man backed toward the door, the taller man walked toward the door. She caught another glimpse of him when he turned to exit. The men turned, walked across the lot, turned to look back at the store, and ran down the street. It was not dark outside. She had been between two and nine feet from the robbers during their presence in the store.

In court, Naeyaert identified defendant as the taller man who took the cash from the drawer. About two hours after the robbery, she viewed six photographs at the Zion police department. The police officer did not tell her that one of the men would be in the array. In court, Naeyaert identified the photograph she selected as the perpetrator on November 5. She also identified defendant as the man in the photograph.

Naeyaert also remembered that the perpetrator's eyes were red and glassy, as if he had been drinking; however, she did not include this fact in her description to the police. She did not tell the police whether the perpetrator's skin was light or dark, but she said his hair was short. While he was in the store, she saw his face only for

a few seconds at a time. She also paid attention to the fact that he touched the drawer handle; she did not touch the handle because she wanted to preserve his fingerprints. In the array of photographs, while all the subjects were black, some had lighter or darker skin color. Upon reviewing the photographs on cross-examination, Naeyaert admitted that defendant's skin was the darkest of the lot. The police never conducted a lineup or a showup of the defendant in person.

Mohamed Vakili testified that he saw the two men enter the store. The taller man was about 6 feet 2 inches tall with broad shoulders, in his mid to late twenties, weighed about 180 to 185 pounds, and wore short hair and a small moustache. Vakili could not remember their jackets. Vakili was about two or three feet away from the men across from the order counter. The room was fairly well lit by fluorescent lights. A deliveryman took an order from the men while Vakili was taking telephone orders. Vakili did not look directly at the taller man. After Vakili posted the order taken by the deliveryman, he turned to make pizzas. Five to ten minutes later, he saw the two men, who were demanding money while standing on the employee side of the counter. The shorter man held a gun to Vakili's nose and said, "Maybe you'll cooperate if I shoot this person." The taller man was four to five feet from Vakili and looked at both him and Naeyaert. While being pushed around by the shorter man, Vakili could see the taller man's face. Vakili watched him for about a minute and from only a foot away as they went to the back office and back to the register. Naeyaert opened the drawer. Vakili could see the taller man's face when the men removed the money from the drawer.

Vakili believed that he had seen the taller man several times before on the street and twice in the store. In court, Vakili identified defendant as the taller robber. The Zion police department showed him many photographs of black males between the ages of 20 and 60. He viewed 2½ trays of photographs. In court, Vakili identified the photograph he selected the evening of November 5 and identified defendant as the subject of the photograph. Vakili stated that while he had seen the man before the robbery, he did not know his name. The police gave Vakili no opportunity to identify him in person or to view a lineup. He remembered that the perpetrator had big and pink eyes, that his skin was dark, and that he had a wrinkle on his forehead.

During cross-examination, defendant sought to impeach Vakili by confronting him with evidence of the misidentification in the

subsequent mugging incident. The trial court permitted defendant to examine Vakili outside the presence of the jury to establish an offer of proof. One night about three weeks prior to the trial, Vakili and his brother were assaulted by three men. The Zion police department had Vakili examine three handfuls of photographs of black males from which he identified one. Vakili was subsequently told that this subject was in the penitentiary at the time of the assault. During the assault, Vakili had only one or two minutes to see the subject, and the light came from a streetlight about a block away. Vakili claimed to have experienced memory problems in the last few months because of stress. Based on this testimony, the trial court ruled that the defendant could not impeach Vakili with this line of evidence.

Officer Charles Kehr of the Zion police department testified that whether a fingerprint is left on a surface depends on the texture of the surface or on smudging. Kehr saw the evidence technician remove prints from a counter and a glass partition. Kehr also examined an order form for a pizza which the employees told him was placed by the robbers. The form listed a telephone number which Kehr determined was registered to an address of 8343½ S. Racine Street in Chicago.

Detective Ray Nichols of the Zion police department testified that on November 5, 1989, he presented approximately 200 photographs in four trays to Vakili. The photographs showed only black males of varying ages. Vakili selected one from the second tray. In court, Nichols identified the photograph of defendant as the one Vakili selected. Nichols then testified that he called Naeyaert to the station to view an array of six photographs, and she selected defendant's photograph. Nichols kept Vakili in a separate room when Naeyaert made her selection and did not tell her that Vakili had selected a suspect until she had made hers. When selecting the five other photographs for the array, Nichols was not aware that Vakili had told a police officer that the suspect had dark skin.

Nichols arrested defendant in Chicago on February 11, 1990. Defendant said that his address was 3855 S. Princeton, he was 6 feet 2 inches tall, and he weighed 185 pounds. The police department never determined the identity of the gunman of the robbery. Nichols made a copy of defendant's fingerprints, but they did not match those found at the scene of the crime on the counter or drawer.

Defendant called Earnette Beasley, his fiancee, to testify. On November 5, 1989, defendant went to her apartment at 942 Cleve-

land Street in Chicago at 3:15 p.m. He left for about five or seven minutes to run to the store around the corner with friends. They liked to buy food on Sundays when they watched football games. He did not leave the apartment again that afternoon.

Beasley remembered that weekend because on Friday, November 3, they both went to city hall to get their baby's birth certificate, and the next day she braided defendant's hair. She identified a certified copy of the birth certificate, which was stamped "NOV 03 1989." That Sunday was also unusual because Kevin Johnson had come with their usual friends Keith Burruss, Gene and Rochelle Porter, and others. She did not discuss her testimony with anyone. She stated that she had known defendant for six years, one of his eyes noticeably leaned or strayed, and he would not wear glasses. She did not know November 5 would be important until three months later. She usually shops for groceries when her check arrives, usually on the third day of the month.

Keith Burruss remembered meeting Beasley and defendant at city hall on November 3. That day was one of the few times he had ever gone there. They then went to the residence on Cleveland Street. He left on November 4 and returned November 5 with Kevin Johnson. They stayed the whole day except when they went to the store. Defendant was with them the whole day. Burruss did not discuss his testimony with anyone and would not lie to protect defendant. Burruss did not know at the time that the date of November 5 would be important.

Defendant also testified that on the afternoon of November 5 he was home with Beasley, Burruss, Johnson, and other friends. He left to go to the store for about 10 minutes. He had never been to the Domino's Pizza store in Zion and did not know where it was.

Gene Porter testified that on November 5, 1989, he watched a football game with defendant and other friends. They spent a few minutes going to the store, and he thought they went during halftime, about 1 p.m. They all stayed for dinner, and Porter left about 9 p.m. He remembered the date because he also bought a car that day, and his wife took Beasley to the grocery store in it. Beasley would have received her check on the third of the month.

Kevin Johnson failed to respond to the subpoena requiring his presence at the trial.

The counsel made closing arguments, and the court instructed the jury. When the jury requested to see the photographs, the court granted the request. The trial court cut the photographs so only the faces and not the police booking numbers were visible. The remain-

ing portions of the photographs, below the subjects' necks, have not been preserved in the record on appeal. The back of defendant's photograph bears a notation of "HGT: 602 WGT: 185." The other photographs bear similar notations of height and weight. Each of the six photographs shows a young, black male with a small moustache and short hair, although the shade of skin varies. The jury asked the court whether the fact that the court admitted the six photographs into evidence meant that the evidence was "procedurally correct." The court declined to answer the question. The jury found the defendant guilty. The trial court denied counsel's motion for a new trial and defendant's *pro se* motion for a mistrial which was based in part on his statement that the other five subjects in the photographs had different heights, weights, and complexions.

■ We first note that the prosecution has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime. (Ill. Rev. Stat. 1991, ch. 38, par. 3—1; *People v. Slim* (1989), 127 Ill. 2d 302, 307.) A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. (*Slim*, 127 Ill. 2d at 307; *People v. Richardson* (1988), 123 Ill. 2d 322, 353.) The jury has the burden of determining the credibility of the witnesses, weighing the evidence, drawing reasonable inferences, and resolving conflicts in the evidence. (*Slim*, 127 Ill. 2d at 302.) A reviewing court will not set aside a judgment unless the proof is so implausible as to create a reasonable doubt of the defendant's guilt. (127 Ill. 2d at 307; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) The weight given to alibi evidence is a question of credibility for the jury, which has no obligation to accept the alibi testimony over a positive identification. *In re C.A.H.* (1991), 218 Ill. App. 3d 577, 581.

Defendant notes that the identification was the central question in the cause (see *Richardson*, 123 Ill. 2d at 353) since the State produced no physical evidence linking defendant to the crime despite the lifting of fingerprints. Defendant contends that the identification by Naeyaert was suggestive because defendant's skin was darker than that of any of the five other men in the photographs. (*Cf. Richardson*, 123 Ill. 2d at 348.) Defendant's photograph was placed in Naeyaert's array because Vakili selected that photograph. Defendant argues that, particularly in view of this suggestive procedure, the trial court erred when it refused to allow defense counsel to cross-examine Vakili concerning his alleged misidentification of

an assailant in the unrelated incident occurring approximately three weeks before the trial.

Defendant has located only one case bearing on this issue. In *People v. Renslow* (1981), 98 Ill. App. 3d 288, the defendant sought to impeach the identifying witness by asking him whether he selected a photograph of the second perpetrator of the robbery. The court held that such proposed impeachment would have been improper because the defendant had not shown that the witness actually misidentified the second robber; otherwise, the court commented, the evidence would have been admissible. (98 Ill. App. 3d at 293-94.) The State notes that, in *Renslow*, the witness' ability to observe the first robber was the same as that of the second robber, whereas in the cause before the court the circumstances were entirely different.

■ The trial court has a wide latitude of discretion in controlling cross-examination. (*Collins*, 106 Ill. 2d at 269.) Generally, a defendant has the right to pursue any kind of impeachment of the witnesses because one of the purposes of cross-examination is to test the credibility of the witnesses. (106 Ill. 2d at 269.) Since the credibility of the witness is always relevant, defendant's proposed impeachment was arguably relevant. His purpose was to cast into doubt Vakili's identification or experiential abilities.

However, the cross-examiner may not impeach a witness on a collateral matter by introducing extrinsic evidence; the cross-examiner must accept the witness' answer. To determine whether a matter is collateral, the court tests whether the matter could be introduced for any purpose other than to contradict the witness' assertion. (*Collins*, 106 Ill. 2d at 269.) This rule prevents surprise, the waste of time, and the confusion of the jury with extraneous issues.

■ In the cause before the court, defendant offered to impeach Vakili through cross-examination only rather than with the introduction of extrinsic evidence. Vakili would have testified that he did select a photograph of a man he suspected had assaulted him. However, his proposed testimony that the person he selected was incarcerated at the time was inadmissible hearsay. Defendant made no offer of proof establishing the existence of admissible evidence to prove that the person was incarcerated at the time in question. Even assuming the existence of such evidence, it would have violated the collateral evidence rule. (*Collins*, 106 Ill. 2d at 269.) The identity of this assailant was not directly relevant to the issue of who robbed the pizza store. Thus, defendant's proposed testimony

would have relied on collateral matters which were not admissible. The trial court's ruling which barred the line of testimony prevented confusion potentially arising from diversion of the jury's attention from the central issue in the trial.

Although the trial court may have some discretion in applying the collateral evidence test (*Collins*, 106 Ill. 2d at 269-70; 3A J. Wigmore, Evidence §1003, at 964; §1006, at 978 (Chadbourn rev. 1970)), we find that it did not abuse that discretion. While the evidence may have had some relevance, its probative value was questionable in comparison to its potential for proliferation of issues. Vakili did not have a good opportunity to view the assailant at the dark scene of the second mugging incident. (See *Slim*, 127 Ill. 2d at 308.) The conditions of that incident were not shown by the offer of proof to correspond to those of the armed robbery in question. The evidence of the alleged misidentification did not impugn Vakili's powers of observation in a well-lit room. Additionally, Vakili testified to having seen defendant on the street several times and twice in the store. This element of recognition was not shown to have been available to Vakili at the time of his alleged subsequent misidentification. We dismiss as unfounded speculation defendant's argument that cross-examination concerning the subsequent mugging incident might have disclosed racial motives affecting Vakili's testimony. It is noted that Vakili's identification of defendant's photograph occurred more than five months before the mugging. The trial court may exclude evidence when its probative value is substantially outweighed by the factors of confusion of the issues, waste of time, undue prejudice, cumulative evidence or other factors. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 167-68 (5th ed. 1990); 3A J. Wigmore, Evidence §991, at 922 (Chadbourn rev. 1970); see Fed. R. Evid. 403.) The trial court may reject offered evidence if its remoteness or uncertainty gives it slight probative value. (*People v. Ward* (1984), 101 Ill. 2d 443, 455.) We conclude that the trial court did not abuse its discretion in barring the evidence.

For the above reasons, the judgment of the circuit court is affirmed.

Affirmed.

INGLIS, P.J., and UNVERZAGT, J., concur.