THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL BERBERENA *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—92—3732, 1—92—4365 cons.

Opinion filed August 12, 1994.—Rehearing denied September 21, 1994.

1034

Marc R. Kadish, of Chicago (Debbie L. Bowers and Thomas S. Reed, of counsel), for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a joint trial before separate juries, Daniel Berberena (Berberena) and Luis "Orlando" Santiago (Santiago) were convicted of first degree murder (720 ILCS 5/9—1 (West 1992)). The trial court sentenced Berberena to 60 years' imprisonment and Santiago to 50 years' imprisonment. On appeal, defendants argue that: (1) the trial court erroneously admitted a "gang roster" which listed the names of certain Latin King members, including defendants, who were allegedly present at a meeting which preceded the crime; (2) the evidence was insufficient to convict Santiago; (3) the trial court erred in denying defendants' motion for a new trial on the ground of newly

discovered evidence; (4) the trial court erroneously precluded defendants from impeaching a State witness with a police report; (5) the trial court erred in refusing to allow defendants to impeach another State witness with a prior juvenile conviction; and (6) the trial court erroneously allowed the State's expert witness to testify that although gun residue tests performed on Berberena were inconclusive under Chicago police department standards, Federal Bureau of Investigation (FBI) standards indicated that Berberena had fired a gun the day of the murder.

## BACKGROUND

The State presented the testimony of two eyewitnesses to the murder: Johnathan Hinton (Hinton) and Christopher Smallwood (Smallwood). Hinton and Smallwood were members of the street gang known as the "Insane Deuces"; Scott Arnoni (Arnoni), the victim, was a former member of the same gang. Hinton and Smallwood testified that on February 3, 1991, at about 7:15 p.m., they were walking east with Arnoni through the alley behind the 2100 block of West Barry. As the three walked through the alley, they heard a car approaching from behind them, and they separated to allow it to pass. Hinton and Smallwood moved to the left side of the alley, so that they were on the driver's side of the car, and Arnoni moved to the right so that he was on the passenger side.

The vehicle, a brown Cadillac, approached slowly with its windows open. Hinton and Smallwood looked inside the car and observed the defendants: Santiago was driving and Berberena was sitting in the front passenger seat. Hinton and Smallwood recognized Berberena and Santiago from the neighborhood, and they knew them to be members of the Latin Kings. Smallwood also recognized Antonio Santos as one of the passengers in the back seat. At that point, Berberena yelled "King Love," extended his hand out the passenger side window, and fired four to five shots at Arnoni.

Hinton and Smallwood fled; Hinton ran through a gangway and Smallwood ran through the alley. The two then met up again and returned to the alley, where they found Arnoni bleeding and throwing up blood. They alerted the neighbors, and an ambulance and police cars arrived shortly thereafter. Arnoni, who was unconscious, was taken to Illinois Masonic Hospital, where he died the following morning.

Both Hinton and Smallwood testified that they initially spoke with uniformed officers at the scene of the crime but they did not give them any information other than their names and addresses. Later, they spoke with gang crimes officers whom they knew from

the street and with whom they were more comfortable. Hinton and Smallwood told these officers that Berberena was the shooter and Santiago was the driver; they also gave the officers a description of defendants and the brown Cadillac. Later, Hinton and Smallwood went to the police station and examined books of photographs from which they were able to identify Berberena and Santiago. Both Hinton and Smallwood also identified Berberena and Santiago in separate lineups. Finally, in court, Hinton and Smallwood identified Berberena as the shooter and Santiago as the driver.

On cross-examination, Hinton stated that he spoke with Officer Ortiz but denied telling him that he could not recognize the four persons who were in the brown Cadillac. He denied telling Officer Ortiz that the offenders were four unknown Latin males in their 20's. He stated that he told Officer Ortiz that Berberena was the shooter and Orlando was the driver. Hinton also denied telling Donnie Davis, another member of the Deuces, that he never saw who was in the car on the night of the shooting. On cross-examination, Smallwood stated that he did not recall speaking to Officer Ortiz.

Next, the State called gang crimes detective Edward Wiora, who testified that on the night of February 3, 1991, at about 7:30, he was working with his partner, Joe Rodriguez, when he received a call regarding a shooting which had occurred at 2126 West Barry. At the scene, he spoke with Hinton and Smallwood, who described the offenders as four male Hispanics some of whom they knew: they identified the shooter as Daniel Berberena and the driver as Orlando. Smallwood also identified a light-skinned Puerto Rican in the back, but at the time he did not know his name. Next, the officers, along with Hinton and Smallwood, toured the area in Wiora's vehicle while searching for the offenders. After their efforts proved unsuccessful, the officers brought Hinton and Smallwood to the station at Belmont and Western to view books of photographs; Hinton and Smallwood independently picked out Berberena and Santiago.

Wiora and three other detectives then left the police station and drove around the area of the Lathrop Homes, looking for Berberena and Santiago. They located Berberena, placed him under arrest, and brought him back to the station where both Hinton and Smallwood identified him as the shooter.

The following morning, Detective Wayne Johnson was assigned to the Arnoni murder investigation and he was told that three other offenders were still being sought. He spent the next few hours looking for the offenders, and when he returned to Area Six he discovered that Orlando Santiago had surrendered with his attorney and was in custody. Santiago's girlfriend, Marisol Martinez, was also at the po-

lice station. Detective Johnson spoke with Martinez and asked her if she knew Santiago's whereabouts the previous evening, if she knew Berberena, Antonio Santos, Laureano Santiago or of a brown Cadillac belonging to any of those men. After Johnson asked Martinez these questions, she left the room and went to talk to Santiago. Johnson then observed Martinez make several phone calls on different pay phones at Area Six. After Johnson alerted the gang crimes officers that Martinez was acting suspicious, a surveillance team consisting of Detective Wiora and several other gang crimes officers was set up.

Wiora observed Martinez leave Area Six and go across the street to a restaurant where she made two phone calls. About 30 minutes later, Martinez got into a cab, and Wiora and his partners followed the cab in separate cars. Eventually Martinez got out of the cab at Hoyne and Norwood, where she went into a building. Wiora saw the brown Cadillac parked on the street, ran the license plates and was informed that the car belonged to Antonio Santos. Wiora was advised by other officers in the surveillance team that two people were hiding at the rear of the building which Martinez had just entered. Martinez came out of the building, got into Santos' Cadillac and pulled into the alley. At that point, the two men hiding near the building got into the car. Wiora pulled the brown Cadillac over, arrested Antonio Santos and Laureano Santiago, and brought them to Area Six. Santos' Cadillac was taken back to Area Six, where it was processed by Detective Johnson. Johnson recovered a tire iron, a baseball bat, and a spiral notebook with a handwritten list of names followed by dollar amounts.

At approximately 10:20 p.m., John Naujokas, an evidence technician with the Chicago police department, collected samples from Berberena's hands in preparation for a gunshot residue test. In response to standard questions, Berberena stated that he washed his hands around 7:20, he was right handed, and his hobbies included working on cars. Naujokas stated that Berberena did not tell him that he had worked on his car that afternoon.

Robert Berk, an employee of the Chicago police crime laboratory, analyzed the results of the gunshot residue test and determined that the test results were inconclusive. Berk explained that under the Chicago police department standards, an individual tests positive for having recently fired a gun only if a minimum threshold level of three metals (lead, barium, and antimony) is present. In this case, the level of lead found on Berberena's hands did not meet the threshold amount. However, Berk also testified that the FBI standards do not test for lead levels, and under those standards, Berberena's test

would have rendered a positive result. Although Berk stated that it was possible to have elevated levels of barium and antimony by working on cars, he also noted that the swabs of Berberena's hands indicated that his hands were clean. Berk further explained that one's hobbies and occupation were not as significant as what a person had done within a two-hour time period before the test.

Santiago presented the following evidence in his defense. Maria Gonzales (Gonzales) testified that at about 9:30 a.m. on February 3, 1991, she and Santiago drove to Hill Correctional Center in Galesburg, Illinois, to visit her boyfriend, Miguel Figueroa. Galesburg is approximately 3 1/2 hours away, and the pair arrived at Hill Correctional Center around 1 p.m. Gonzales stated that she filled in the required information on the visitor sign-in sheet for both herself and Santiago. She did not fill in the arrival and departure times, however; the prison guard was responsible for recording the time. Since she had been to the prison before, she did not have to fill out a visitor interview form. Santiago did, however, and after she filled it out for him, he signed it. Both she and Santiago presented proper identification and were admitted to the penitentiary.

Gonzales testified that they visited with Figueroa for approximately six hours and they had photographs taken together during this time by the prison photographer. She stated that four photographs were taken on February 3, 1991, and she identified two of the photographs at trial: one depicted Santiago, Figueroa, and herself; the other depicted Santiago and Figueroa. Gonzales stated that they left the penitentiary around 8 p.m.

Gregory Hurd (Hurd), the gatehouse guard responsible for processing visitors at the Hill Correctional Center on February 3, 1991, explained the admission procedures for visitors. He stated that the visitors must enter their names, addresses, and the name of the inmate whom they are visiting into the sign-in log. In addition, visitors must provide two valid forms of identification before they are permitted to enter the penitentiary. Hurd testified that visitors are not allowed to fill in the time that they arrive and depart; only the gatehouse guard may do so. Hurd identified an undated prospective interview sheet for Santiago, but stated that he did not see Santiago or Gonzales actually fill the form out, and he did not know what day the form was completed. He also stated that he had seen Santiago at the penitentiary prior to February 3, 1991. Finally, Hurd testified that because his shift ended at 3 p.m. on February 3, 1991, he would not have entered the departure time for anyone leaving subsequently.

Next, Jorge Rodriguez, the prison photographer, testified that after visitors purchased coupons and tendered them to him, he would

take their picture and log the coupons in his log book. His log book indicated that he recorded 107 coupons on February 3, 1991, and number 66 was for Miguel Figueroa. Rodriguez remembered taking the photograph of Gonzales, Santiago and Figueroa on February 3 at about 7 or 7:30 p.m.; he was able to recall the time because Figueroa wanted his photographs taken at the end of the visit, and Figueroa had asked Rodriguez to stay late to take the photograph. Rodriguez also acknowledged that Figueroa and other gang members ran the tier of the prison where he resided.

Finally, Robert Vanderzyl, the record office supervisor, testified that he had custody of the visitor sign-in log, prospective interview forms and the photographer's log; to his knowledge, no one had access to these records. He also stated that it was not possible for inmates to come into his office and tamper with the records. Vanderzyl identified Santiago's and Gonzales' entry in the sign-in log for February 3, 1991; the log indicated that they were admitted to the penitentiary at 2:51 and they departed at 8:05.

Berberena presented the following evidence in his defense. At the time of the shooting, Berberena was living with his sister and legal guardian, Noreen Casternon (Noreen). On the afternoon of February 3, 1991, Berberena spent two to three hours fixing his car. Around 4:30, Alberto Rodriguez, Noel Andajar, Laureano Santiago, and Antonio Santos drove up in the brown Cadillac owned by Santos. Berberena got into the car and the group drove to Hirsch and Spaulding to buy marijuana. After they drove around and smoked a joint, the group returned to the Lathrop Homes around 6 p.m. Berberena went home to shower while the rest of the group went to a Latin Kings meeting. Berberena noticed his neighbor, Yolanda Garcia (Yolanda), and his girlfriend, Joanna Telez, across the street when he returned. Since Berberena had locked himself out of the house, he crawled through the window to get inside. Once inside, he invited his girlfriend to come over. Shortly afterward, his sister, her husband and her daughter came home.

Berberena and his girlfriend left around 6:30; Berberena headed for the Latin Kings meeting on Leavitt and Diversey, and his girlfriend left in the opposite direction. When Berberena reached the meeting place about 5 or 10 minutes later, the meeting was breaking up and the members were dispersing. Berberena saw Alberto Rodriguez, who was driving Berberena's car, and he got into the car with him. Alberto Rodriguez dropped Berberena off at home at about 6:45 or 6:50, and Berberena did not leave the house again until police officers came and arrested him. He spent the rest of the evening talking with his sister and their neighbor, Yolanda Garcia.

Berberena conceded that the Latin Kings were at war with the Deuces over territory and that the Deuces had shot a Latin King shortly before Arnoni was killed. He acknowledged that Latin Kings meetings were held on Sunday evenings from 6 to 7 p.m. in a basement at the Lathrop Homes, and Antonio Santos often acted as secretary at these meetings. He admitted that members paid $10 dues at these meetings to buy guns which could be used to retaliate against the Deuces. Berberena stated that there were four "Danny's" in the Lathrop branch of the Latin Kings. At trial, when the State read a list of names from a gang roster, Berberena stated that he recognized the names on the list. However, Berberena maintained that he was never shown the list of names at the police station and he did not say, "it's my name, so what?" to Detective Johnson.

After being arrested, Berberena talked to an assistant State's Attorney (ASA) and told the ASA that he was in the brown Cadillac earlier that afternoon buying "reefer." Berberena told the ASA that he went home around 6 p.m. and that his sister, her daughter and her husband were there. Berberena stated that he did not tell the ASA that he did not arrive home until after 7 p.m. and that nobody else was home until 7:30. While in custody, Berberena did become friends with an individual named Donnie Davis, but he never agreed to help Donnie Davis with any of his pending cases.

Berberena's account of his whereabouts on February 3, 1991, was corroborated by the testimony of his sister Noreen, and their neighbor Yolanda, who lived across the street. Both Noreen and Yolanda testified that they observed Berberena working on his car for two to three hours on the afternoon of February 3, 1991. Noreen testified that when she came home around 6 p.m. that evening after shopping, Berberena was at home with his girlfriend. The pair left about 15 or 20 minutes later and Berberena returned home alone at about 6:45 p.m. Noreen testified that Berberena did not leave the house again until he was arrested. He spent the rest of the evening talking with her and their neighbor, Yolanda. Yolanda testified to substantially the same chain of events.

Donnie Davis, a former Latin King and current Deuce member who knew Christopher Smallwood and Johnathan Hinton, testified on behalf of Berberena and Santiago. Davis explained that he met Hinton after being released from prison in July 1991, and since the two were both Deuces, they hung out together every day. One day in August after Arnoni was murdered, Davis and Hinton were on their way to the swimming pool together when they ran into Jeff Miller, a fellow Deuce. Miller appeared to be angry at Hinton, so Davis asked Hinton why Miller was angry. Hinton told Davis that Miller was

upset because Hinton did not know who killed Arnoni or how many Latin Kings were in the car the night that Arnoni was shot.

At the time of his testimony, Davis was in custody and resided on the same tier as many Latin Kings. In fact, while in custody, Davis had met and become friendly with Berberena, whom he knew to be a Latin King. However, Davis insisted that he was not testifying for Berberena, who was a rival gang member, in exchange for Berberena's help with his pending cases.

Officer Ortiz testified (before both juries) that he was the beat officer on the night Arnoni was killed. He went to the scene of the incident and filled out a beat officer's police report. The report which Ortiz and his partner completed did not include Berberena's or Santiago's name; instead, the offender description box was marked "unknown." Although Ortiz's report stated "Smallwood related," he insisted that he never actually spoke with Smallwood because the gang crimes detective left with him and Hinton before Ortiz could interview them. Thus, he explained that the information in his report came from other officers present on the scene.

After both sides rested, an *in camera* proceeding was held regarding the admission of the gang roster notebook recovered from Santos' car which the State sought to admit for the purpose of rebutting defendants' alibis indicating that they were not at the gang meeting. Santos advised the judge that he would invoke his fifth amendment right if he were called to testify about the gang roster. After extensive argument, the court determined that relevant portions of the statements which Santos made to ASA Kelecius at the time of his arrest would be admissible as a statement against penal interest in order to lay a foundation for the admission of the gang roster as a business record. Thus, the judge determined that ASA Kelecius would be allowed to read portions of Santos' statements into the record for the sole purpose of laying a foundation.

In rebuttal, the State presented the following evidence. First, the State called Detective Norfie Ciciolla to impeach Donnie Davis. Ciciolla testified that he spoke with Davis at Cook County jail and asked Davis why he would testify for Berberena, a rival gang member. According to Ciciolla, Davis stated that he and Berberena were friends, that Davis was in the same division as many other Latin Kings, and that Berberena promised to help Davis with some of his pending cases.

Next, the State called ASA Laura Morask to impeach Jorge Rodriguez (Rodriguez). ASA Morask testified that Rodriguez told her that gangs ran the prisons and that he was viewed as a Latin King gang member in Galesburg, his new prison. Rodriguez related that he

grew up with Miguel Figueroa, a known Latin King leader of the Lathrop projects. Finally, he stated that inmates with office jobs had access to office records, such as visitor logs.

Detective Johnson testified that he found a notebook in the back seat of Santos' car and that he spoke to Santos and Berberena about the notebook. Johnson told Berberena that he recovered the list from the car used in the Arnoni murder and that Santos had identified the list as the attendance list taken at the meeting that night. Berberena then told Johnson that he was at the meeting, but "so what?" He also told Johnson that he did not know anything about Arnoni's murder.

(Presented to Berberena jury only:) ASA Kelecius testified that he spoke to Berberena on February 4, 1991, about the Arnoni murder. Berberena admitted that he was a Latin King, said he knew "Orlando" Santiago and gave Kelecius three versions of what he was doing during the previous evening. Berberena first told Kelecius that around 5:30 or 6 p.m. he was in front of his house when Santos, Santiago and Noel drove up in a brown Cadillac. The group went to Hirsch and Kedzie, bought some marijuana and smoked it. Around 7 p.m., Berberena was dropped off at home where his sister, her boyfriend, her daughter, Joanna Telez and Yolanda were present. When Kelecius asked Berberena if these individuals would confirm his presence at 7 p.m. if they were brought to the police station for questioning, Berberena changed his story. Berberena then told ASA Kelecius that when he was dropped off, nobody was home and he was alone until 7:30, when Noreen and her boyfriend came home. Then Yolanda came over. When Kelecius asked Berberena what happened to Telez, he changed his story again. Berberena said that he was dropped off around 7 p.m., sat on the front porch for about 30 minutes until Telez arrived and then the two of them were inside alone until around 8 p.m. when everyone else came home.

Both juries heard through Kelecius' testimony that Antonio Santos said that he was a Latin King and, as secretary, it was his job to take down names of the Latin Kings who attended meetings and the money that they owed. The Latin Kings met three times a month at 6 p.m. and dues of $10 were paid at every meeting. Santos identified the spiral notebook as the list he compiled to reflect the attendance at the February 3, 1991, meeting. The first column of names listed the names of the Latin Kings who attended the meeting; the second column was a list of members who were absent. The names "Danny" and "Orlando" appeared in the first column.

Finally, Robert Ditusa, a Chicago police gang crimes officer who had monitored the Lathrop Homes branch of the Latin Kings for 12

years, stated that he knew that Luis Santiago's nickname was "Orlando" and that Berberena's nickname was "Danny." He further testified that he did not know of any other Orlando or Danny in that branch of the Latin Kings.

OPINION

I

Defendants contend that the trial court committed reversible error by admitting the gang roster into evidence because, *inter alia*, it did not meet the requirements of the business record hearsay exception. 725 ILCS 5/115—5 (West 1992).

●1 In a criminal proceeding, the foundation required for admission of a writing or record under the business records exception is that: (1) the writing or record was made as a memorandum or record of the act, transaction, occurrence, or event; (2) it was made in the regular course of business; and (3) it was the regular course of such business to make such a record at the time of the transaction or within a reasonable time thereafter. (725 ILCS 5/115—5 (West 1992); *People v. Tsombanidis* (1992), 235 Ill. App. 3d 823, 835.) For the reasons which follow, we conclude that the gang roster was erroneously admitted in evidence because the State failed to demonstrate that it was the regular course of the gang's business to make such a record.

The roster which was admitted into evidence contained two columns of scribbled nicknames, some of which were followed by a "P" and/or a dollar amount. The first column did not have a heading; the second column contained the heading, "*Absent.*" The roster was unsigned and undated. In an attempt to lay a foundation for the roster, ASA Kelecius read the following portions of Antonio Santos' statements into evidence:

"Q. I would like to direct your attention to February 3rd of 1991, this last Sunday. Did you go to a meeting?
A. Yes, I did.
Q. And whose meeting was this?
A. The Latin Kings meeting.
Q. Are you a Latin King?
A. Yes I am.
Q. How often do these meetings take place?
A. Three times a month.
Q. Are there any dues that you pay?
A. Yes, I, we do.
Q. What do you pay? When do you pay the dues?
A. $10 every time we meet.

Q. Now getting back to the Latin Kings meeting on Sunday. What time was that meeting?

A. Six o'clock [p.m.]

* * *

Q. Where was the meeting?

A. By 2700 North Leavitt.

Q. How many people came to the meeting?

A. About 15 or 16.

Q. Do you have anything specific that you had to do for this meeting?

A. Yes I did.

Q. What was that?

A. To take the names, to take down the names and what they owe.

Q. Why is it that you had to do this?

A. I am the secretary of the Latin King nation.

Q. How long have you been the secretary?

A. For four months.

Q. I am showing you what I have marked as People's Exhibit Number One. Would you please take a look at this?

A. Okay.

Q. Do you recognize what this is?

A. Yes, I do.

Q. What is that?

A. The list of all the people's money.

Q. Who filled out that list?

A. I did.

Q. Does it have two columns?

A. Yep, it does.

Q. What is in the first column?

A. Who attended and how much they paid.

* * *

Q. Do you write all the names? Did you write all the names?

A. Yes I did.

Q. What is in the second column?

A. All the people who did not attend.

Q. How come some people have $20 and not $10?

A. Because some of them had to pay more than others."

The business records exception to the rule against hearsay is premised on the recognition that records of an act, occurrence, or event that are routinely made at the time of the occurrence, or within a reasonable time thereafter, are normally sufficiently reliable to be admissible in evidence despite their hearsay character. (*Tsombanidis*, 235 Ill. App. 3d at 835.) The credibility of a business record depends on the *regular, prompt, and systematic nature of the entry* and the

fact that it is relied on in the operation of the business. *Tsombanidis,* 235 Ill. App. 3d at 835; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10 (6th ed. 1994).

●2 In the case at bar, there was no evidence that the roster was made in a "regular, prompt, and systematic" manner as required. Nor was there any testimony that anyone used or relied on these hearsay writings. No other rosters or gang records of any kind were produced. In fact, the roster was one piece of paper within a spiral notebook found in the back of Santos' car. We are compelled to conclude that this roster does not manifest the necessary indicia of reliability required for admission as a business record.

Having concluded that the court erred in admitting the roster into evidence, we must now determine whether the error was harmless. In Santiago's case, we conclude that it was not.

Santiago presented evidence which indicated that at the time of the murder he was visiting an inmate at a prison located 3¹/₂ hours away from Chicago. Gonzales testified that she and Santiago drove to the prison together on the morning of February 3, 1991, and arrived at the prison at about 1 p.m. After complying with various visitor admission procedures, Gonzales and Santiago spent about six hours visiting with Figueroa before leaving at about 8 p.m. Gonzales also testified that they had their picture taken with Figueroa. Gonzales' testimony was corroborated by prison business records which indicated that Santiago was admitted to the prison at 2:51 p.m. and departed at 8:05. Gonzales' testimony was also corroborated by the prison photographer, who testified that he took Santiago's picture at about 7 p.m. on February 3, 1991.

●3 In contrast, the State presented the testimony of two eyewitnesses who were also rival gang members. Hinton and Smallwood testified that they saw Santiago driving the car from which the fatal shots were fired on February 3, 1991, at around 7 or 7:30 p.m. Other than the testimony of these rival gang members, the roster provided the only piece of evidence which placed Santiago in Chicago on the night of the murder. Because the evidence was so closely balanced, the admission of the gang roster may have unfairly tipped the balance in the State's favor. We are unable to conclude beyond a reasonable doubt that the outcome would have been the same without the admission of the roster and, therefore, Santiago is entitled to a new trial.

We do not reach the same conclusion in Berberena's case, however. Although the State presented the same eyewitness testimony from rival gang members, Berberena's alibi was not as strong. In essence, Berberena testified that he was at his sister's

home, which is not far from the scene of the crime, at the time of the murder. His testimony was corroborated by the testimony of relatives and friends. However, his testimony was also impeached by ASA Kelecius, who testified that Berberena gave three different accounts of his whereabouts in statements following his arrest. We note that in each of these statements he places himself in Chicago, just minutes from the scene of the crime. Moreover, even if the roster is taken as true, it is not inconsistent with his entire alibi; it merely places him at a meeting in a location other than the crime scene, sometime before the crime occurred. Berberena himself testified that he had attempted to go to the meeting, but it was breaking up when he got there. As to Berberena, our review of the evidence establishes the strength of the State's case against him. We also consider the prejudicial effect of the trial court's error. Because the evidence presented at Berberena's trial was not closely balanced, we hold that the trial court's error was harmless beyond a reasonable doubt.

## II

Defendants next contend that the evidence was insufficient to sustain Orlando's conviction.

When presented with a challenge to the sufficiency of the evidence, the relevant question for the reviewing court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237.) We conclude that even without the gang roster, the evidence presented was sufficient.

The State presented the testimony of two eyewitnesses to the crime who testified that Santiago was driving the car from which the fatal shots were fired on February 3, 1991. They identified and described Santiago to the gang crimes officers shortly after the crime occurred. They later selected Santiago from a book of photographs and identified him in a lineup. Finally, they testified at trial that Santiago was indeed the driver of the car at the scene of the crime. We note that the testimony of even one eyewitness is sufficient to sustain a conviction. See *People v. Slim* (1989), 127 Ill. 2d 302, 307; *People v. Jackson* (1992), 237 Ill. App. 3d 712, 718.

●4 It is true that Santiago presented evidence which indicated that at the time of the murder he was visiting an inmate at the Hill Correctional Center, which was $3^1/2$ hours away from Chicago. His alibi was corroborated by several witnesses (Gonzales, Hurd the gatehouse guard, and Rodriguez the prison photographer) as well as prison business records. However, the jury was not bound to accept

this evidence as true. Where the evidence is conflicting, it is the jury's role to determine the credibility of the witnesses. (See *Jackson*, 237 Ill. App. 3d at 718.) Based on the facts presented, we cannot say that no reasonable trier of fact could have found the necessary elements present to convict Santiago of murder.

## III

Defendants next contend that the trial court erred in denying their motion for a new trial on the ground of newly discovered evidence.

The newly discovered evidence in this case consisted of two handwritten summaries of confessions allegedly obtained from codefendants, Antonio Santos and Laureano Santiago, who were in prison since they had also been tried and convicted for the murder of Arnoni. The summaries were prepared by two third-year clinical law students and were not verbatim. In one statement, Laureano Santiago stated that he was driving the car and the shooter was Antonio Santos. He specifically stated that defendants were not in the car. In the other statement, Antonio Santos stated that he shot Arnoni and Laureano Santiago drove his car.

In Illinois, the standard for a new trial based on newly discovered evidence is as follows:

> " '[T]he new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence.' " *People v. Molstad* (1984), 101 Ill. 2d 128, 134, quoting *People v. Baker* (1959), 16 Ill. 2d 364, 374.

●5 In our view, neither the element of conclusiveness nor the element of due diligence has been met in this case, and on these grounds the case at bar is distinguishable from *Molstad*. The unsigned and nonverbatim confessions of two codefendants who have already been convicted and sentenced for the crime at issue can hardly be deemed so conclusive that they would change the result on retrial. This is especially true when we consider the fact that each of these codefendants gave post-arrest statements in which they stated that Berberena was the shooter and Orlando Santiago was the driver. Moreover, the confessions could have been discovered prior to trial if counsel had exercised due diligence. Antonio Santos and Laureano Santiago were found guilty of murder in a bench trial on June 2, 1992, and sentenced on June 16, 1992. The trial of Berberena and Orlando Santiago did not begin until several weeks later on August 10, 1992.

## IV

Next, defendants contend that the trial court erroneously precluded them from impeaching Smallwood through Officer Ortiz.

Defendants called Officer Ortiz for the purpose of impeaching Smallwood's identification of Berberena and Santiago. The defense argued that as evidenced in Ortiz's police report, Smallwood had not identified defendants but instead told Officer Ortiz that there were four male Latinos in their 20's and was unable to provide any further information. However, Ortiz insisted that he had never spoken to Smallwood, but rather he had received the information in his report from other officers who had arrived at the scene before him. After argument, the judge ruled that the defense could impeach Officer Ortiz, but not Smallwood.

The trial court's ruling allowed defendants to bring out the inconsistencies in Officer Ortiz's report. Officer Ortiz testified that he was the beat officer on the night Arnoni was killed; he went to the scene of the incident and filled out a police report. Officer Ortiz conceded that the report which he completed did not include Berberena's or Santiago's name; instead, the offender description box was marked "unknown." Officer Ortiz also acknowledged that his report stated "Smallwood related," but he insisted that he never actually spoke with Smallwood because the gang crimes detective left with him and Hinton before Ortiz could interview them. Thus, he explained that the information in his report came from other officers present on the scene.

•6 We find no error in the trial court's ruling. Officer Ortiz unequivocally stated that he did not speak with Smallwood; if he did not speak with Smallwood, he could not impeach Smallwood. Nor could Smallwood have been impeached with Officer Ortiz's report, as it is improper to impeach a witness' testimony with a written statement made by someone else. See *People v. Lucas* (1989), 132 Ill. 2d 399, 430.

## V

Next defendants contend that the trial court erred in refusing to allow them to impeach Hinton with his juvenile adjudication for burglary.

•7 Evidence of a juvenile adjudication of a witness, other than a defendant, *may* be used for the purposes of attacking the credibility of a witness if: (1) the conviction would be admissible if an adult, and (2) its admission in evidence is necessary to a fair determination of guilt or innocence. (*People v. Wright* (1992), 234 Ill. App. 3d 880, 893; see also *People v. Montgomery* (1971), 47 Ill. 2d 510.) The decision to

admit such an adjudication properly lies within the trial court's discretion. After reviewing the record, we conclude that the trial court did not abuse its discretion in this case.

## VI

Finally, defendants contend that the trial court erroneously allowed Robert Berk, an employee of the Chicago police crime laboratory, to testify that although gun residue tests performed on Berberena were inconclusive under Chicago police department standards, FBI standards indicated that Berberena had fired a gun the day of the murder.

●8 Defendants have waived this issue. At trial, counsel objected to this testimony on the ground that it was *speculative*:

"Q. Under the standards that the FBI tests for would these results that you got in this case—

MR. KADISH: That is speculation. Objection.

MS. O'BRIEN: This witness has been trained by the FBI.

THE COURT: Overruled."

On appeal, defendants now contend that Berk's testimony is more prejudicial than probative. Because objections at trial on specific grounds waive all other grounds of objection, defendants have waived the right to object on the grounds they now assert on appeal. See *People v. Campos* (1992), 227 Ill. App. 3d 434, 449.

For the foregoing reasons, the conviction of Santiago is reversed and the cause remanded for a new trial; the conviction of Berberena is affirmed.

Affirmed in part; reversed in part and remanded in part.

GORDON and McNULTY, JJ., concur.