# Illinois Official Reports

## Appellate Court

---

### *People v. Middleton*, 2018 IL App (1st) 152040

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH MIDDLETON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-15-2040 |
| Filed | June 6, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-12617; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Phyllis Warren, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Justices Fitzgerald Smith and Howse concurred in the judgment and opinion. |

¶ 1   Following a jury trial, defendant Keith Middleton was found guilty of first degree murder while personally discharging a firearm and sentenced to 53 years in prison. Defendant appeals, arguing that he was not proved guilty beyond a reasonable doubt because he was identified by a single occurrence witness, whose description of defendant was severely impeached. Namely, there was conflicting evidence as to whether defendant wore a full or half-ski mask and whether the single occurrence witness could see defendant's face. Defendant also contends the State improperly introduced a demonstrative exhibit during closing arguments depicting defendant with a half-ski mask superimposed over his arrest photograph, but the State neglected to introduce this exhibit at trial. In addition, defendant contends the State elicited improper hearsay statements at trial, the court erred in overruling certain objections, the court erred in admitting video evidence, his trial counsel was ineffective, the State offered improper closing argument, and the court erred in sustaining objections to defense counsel's arguments. While we hold the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, we conclude the State's first-time presentation of the altered arrest photograph during closing rebuttal argument resulted in prejudicial error requiring a new trial.

¶ 2                                    BACKGROUND

¶ 3   Defendant was arrested and then charged with murder after allegedly shooting to death his girlfriend's brother Ricky Brown, then age 30, on March 21, 2012, on the sidewalk outside Brown's home. At trial, the victim's neighbor Toryion Conner testified that he was standing on his front porch around 8:30 a.m. on March 21 at 739 West 61st Street, between South Halsted Street and South Union Avenue, when he saw defendant near the sidewalk across the street and several houses east from where 13-year-old Conner stood.[1] Conner testified that there was nothing blocking his view and he described defendant as an African-American male, with long dreads half pinned back, who was wearing black jogging pants and a gray hoodie bearing black writing and the hood was hanging down. Defendant wore a ski mask that covered only the lower half of his face, which Conner described as going up "right here to the nose." Conner saw defendant look in his direction as he drew a silver revolver from his hoodie. Conner said he saw defendant as he "rammed up on" Brown, who was standing on the sidewalk. Conner knew the victim lived nearby at 720 West 61st Street. Conner heard the victim plead with defendant not to shoot but defendant fired at his chest, causing the victim to fall to the ground. Defendant returned to his car but "came back like he wasn't *** finished with him," and shot the victim again in his upper body. Conner then saw defendant get into a white car and drive off toward Halsted Street. Conner moved from his porch to the hallway and looked out the window, noting he could see the whole block from that vantage point. He saw defendant, still wearing the half-ski mask as he drove west past his house. Conner could see defendant's whole upper body and from his nose "all the way up." The prosecutor clarified for the record that Conner "was moving his hand upward towards his forehead and the top of his head." The State,

---

[1] The State's evidence technician stated on cross-examination that there were five houses plus a vacant lot between 739 West 61st Street and the crime scene, which took place on the north side of the street, and on the other side, three houses plus a vacant lot.

however, did not present the ski mask at trial or ask Conner to identify any image of defendant wearing a ski mask.

¶ 4    Conner testified that he later went to school, where he told his teacher he had witnessed a murder, but denied giving the teacher any additional details. The police were ushered in to interview him, but he denied telling officers that the shooter wore a hoodie or a full ski mask with Velcro. Less than three months later, on May 2, 2012, Conner identified defendant as the shooter from a photo array. On June 7, 2012, Conner identified defendant from a lineup. The State did not ask Conner to identify defendant's mug shot taken on arrest.

¶ 5    Chicago Police Detective Gregory Buie interviewed Conner in his mother's presence at his school the day of the shooting. Detective Buie testified that Conner described the shooter as a black male with long dreadlocks, wearing a gray hoodie with black pants, and a black, half-ski mask. To demonstrate what the ski mask looked like, as Conner described it, Detective Buie held both of his hands right at his nose. In a supplemental report prepared by a different police officer, however, Conner was said to have described the offender as simply wearing a gray hoodie with black trim, a black ski mask, and black jogging pants.

¶ 6    Additionally, Chicago Police Detective Arthur Davis prepared a report the day of the shooting wherein the offender was described as a black male with long dreadlocks and a partial ponytail who was wearing a full, black ski mask with Velcro straps, along with a gray hoodie with black trim and black lettering on the front. Detective Davis also noted that defendant was listed in a police report as being 6 foot 3 inches tall and weighing 225 pounds, facts which Conner never related to any officer.

¶ 7    The State's theory, as explained in greater detail below, was that the shooting related to a personal vendetta against Brown and that defendant drove off in the victim's car after killing him. Brown's girlfriend, Marquea Ambrose, testified that she knew defendant, who went by Thomas, to be dating the victim's sister. On the day in question, she was with the victim at his house when he left for his job at the post office after having parked his white Chevy in front, although he typically parked his car two blocks away presumably due to "concerns." After he left, Ambrose heard two gunshots, then a brief pause before more gunshots were fired. She looked out the window and observed her boyfriend's white Chevy driving toward Halsted Street, although she was unable to see the driver. She then saw Brown dead on the ground.

¶ 8    Pursuant to the State's pretrial motion "regarding prior bad acts," Damien Parker, the victim's childhood friend, testified that days before the shooting, defendant had threatened the two of them with a handgun. Parker also knew defendant by the name of Thomas and knew him to be the boyfriend of the victim's sister, Rachel Brown. On March 9, 2012, Parker and the victim were just leaving Parker's home (78th Street and Ada Street) when they saw Rachel's van pull up behind, notably near where the victim had parked his white Chevy. According to Parker, the victim became "panicky [and] nervous," and the two decided to follow the van to determine whether defendant was inside. The van slowed down as it drove past Ambrose's home, which made the victim "really agitated," but then drove off at a high speed. Parker eventually pulled up next to the van and saw defendant was the driver. The victim tried to hide from view by leaning back. Defendant made eye contact with Parker, nodded and then turned. Parker stopped following defendant. On cross, Parker acknowledged they had followed defendant without any prompting, and defendant at that point had made no threats.

¶ 9    Some 20 minutes after leaving home, Parker and the victim again encountered defendant's van behind Parker's house. Defendant exited the van and told the two to "get the fuck out of the

- 3 -

car." Parker eased his car toward defendant, who was about 15 feet away, but then he saw defendant retrieve a chrome handgun from the van, which he placed in his pocket while again ordering them to get out. Defendant eventually took the gun from his pocket, waving it at the two men while exclaiming, "I got your ass. Get your ass out of the car." While Parker wanted to hit defendant with his car, the victim instead urged him to back up because defendant "might start shooting." Parker did as his friend suggested, prompting defendant to repeat "I got your ass," before returning to his own vehicle. Parker and the victim then flagged a police officer and reported the incident with defendant's name and the license plate, although they did not fill out a formal police report. On the day in question, Parker saw the victim lying dead on the sidewalk and shortly thereafter spoke with police. In June, Parker also identified defendant from a lineup as the person he had seen on March 9.

¶ 10    No fired cartridge cases or bullets were recovered from the crime scene, and the parties stipulated that a revolver does not automatically eject any cartridge cases. Police did find Brown's car a short distance away, where they found the keys in the ignition along with his wallet and several cell phones. The State theorized that on the day of the shooting, defendant drove the victim's car around the corner, where he then hopped into Rachel's van. The victim's car was swabbed biological evidence. None of the DNA swabs taken from the victim's car, including the driver's door latch and handle, steering wheel, and gear shift, matched defendant, and in fact, defendant was excluded from some of the human DNA profiles identified. Similarly, a latent fingerprint taken from the exterior driver's side door did not match defendant. Additionally, the State's medical examiner testified that the victim was shot in the chest and buttocks.

¶ 11    The same day of the shooting, the police were looking for defendant, with Detective Davis making active efforts to locate him. The day after, on March 22, defendant appeared at the police station, although there was no warrant for his arrest or investigative alert at that time. Defendant signed a consent form for police to take his DNA by buccal swab, but he was not then arrested and ultimately left the police station.

¶ 12    Months later, in June 2012, following Conner's identification of defendant and other investigation, police appeared at defendant's workplace where they identified themselves. Defendant fled, jumping onto a dumpster outside the loading docks and then over a 10-foot fence, where he fell to the ground. He was then handcuffed and taken into custody. Detective Davis identified defendant's arrest photograph, which the State entered into evidence, noting that was how defendant accurately appeared when brought into police custody.

¶ 13    The State rested, and defendant presented evidence on his own behalf. Defendant called Tonya Woods, who testified that around 8:30 a.m. on March 21, 2012, she was driving west on 61st Street towards Halsted Street when she saw a young man emerge from a vacant lot on her left wearing black gloves, a black hoodie with the hood on his head, and a full, black ski mask. Woods stated he also had dreads. She saw a gun in the man's hand and thought he would carjack her. He was so close to her car that "if he wanted to stick his hand in the window and snatch me out, he could." Woods passed the man, and as he proceeded behind her car, she saw a second man to her right on the sidewalk. When the man with the gun went across the street, she heard a "pop." When she looked in the rearview mirror, she saw the second man with a white shirt fall to the ground and the first man then walked over and "emptied" his gun in the second man. The shooter then ran towards Union and entered a car. She proceeded to Halsted

Street without that car passing her and then called 911. Eventually, a private investigator for the defense contacted her.

¶ 14    On cross, Woods acknowledged that she also spoke with the state's attorney's investigator in February 2014. She denied telling the state's attorney that the shooting took place on March 23, although the parties later stipulated on rebuttal that is what the investigator would have testified to. Woods admitted omitting from her 911 call that the shooter wore black gloves, and the state's attorney's investigator would testify that she also omitted that detail in their interview. Woods also stated that when she saw the gun, she was not focusing on the shooter's face because she believed she would be carjacked and "so looking at his face is something that I just blacked out."

¶ 15    Conner's teacher Betty Strong testified collectively on direct and cross-examination that on the morning of the shooting, Conner entered class holding his chest, reporting his heart was pounding, then told her he had just seen someone get shot. He stated the shooter was wearing a mask and a black hoodie, but that he did not see the shooter's face. Strong spoke with police outside Conner's presence, but she did not relay the information about the mask and Conner's inability to see the shooter's face.

¶ 16    The defense rested. During closing argument, defense counsel honed in on the key question of whether Conner was actually capable of identifying defendant as the shooter. During its rebuttal argument, the State asserted that Conner's identification was sound notwithstanding the half-ski mask. The State argued Conner "could see the defendant's hair, the defendant's eyes, the defendant's forehead, defendant's legs, his chest, his shoulders." To emphasize this point, the State presented the jury with two, side-by-each photographs. One was defendant's mug shot taken the day of his arrest. The other photo showed the same mug shot, but in the nature of a crude "photoshop" edit, it blacked out the bottom portion of his face, in an obvious effort to show what defendant might look like if wearing a "half-ski mask." *Infra* ¶ 43. At the conclusion of the rebuttal argument, defense counsel objected and moved for a mistrial outside the jury's presence, arguing the photograph with the superimposed mask had not been produced by the State, was not introduced into evidence during trial, and lacked any proper foundation. Defense counsel argued that the State's use of the previously undisclosed exhibit during rebuttal was "extraordinarily prejudicial" in such a way that no instruction could cure. Defense counsel added that therefore she was unable to effectively rebut the matter, which injected "a degree of absolutely egregious unfairness" into the proceeding. The trial court responded that during Conner's testimony, the witness held his hand up to his nose, which would offer evidentiary support for the exhibit, and the State also noted the unaltered arrest photo was in evidence. Defense counsel retorted that they should then be allowed to show a photograph with a full ski mask, given that it, too, was in evidence.

¶ 17    The court stated the objection was noted for the record but essentially an admonishment to the jury was sufficient to cure any alleged error. Before the jury, the court reiterated that attorney arguments were not evidence and further instructed the jury that the altered photo in question was merely demonstrative and not an actual photograph taken. The court stated, "if you don't believe that demonstration is supported by the evidence, you are free to disregard that line of argument in that demonstration," and the court then proceeded to instruct the jury. Notably, the court did not strike the exhibit or the related argument, and it denied the motion for mistrial.

¶ 18    As stated, the jury found defendant guilty of the first degree murder. The defense filed a motion for a new trial or judgment of acquittal and presented supporting testimony. The trial court denied the motion, and defendant filed this appeal.

¶ 19                      ANALYSIS

¶ 20    Defendant first challenges the sufficiency of the evidence to sustain his conviction, arguing Conner's identification was so vague or doubtful that there exists a reasonable doubt of defendant's guilt. Where a defendant challenges on appeal the sufficiency of the evidence, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). As such, in a case like the present, the prosecution has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). A positive identification by a single witness who had a sufficient opportunity to observe the defendant is enough to support a conviction while a doubtful or vague identification is not. *Id.*; *People v. Johnson*, 114 Ill. 2d 170, 189 (1986). We may not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence, the credibility of the witnesses, or the resolution of conflicting testimony. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992). And, the judgment will not be set aside unless the proof is so unsatisfactory, improbable, or implausible as to justify a reasonable doubt as to the defendant's guilt. *Slim*, 127 Ill. 2d at 307.

¶ 21    Defendant argues the judgment must be set aside because the only proof that he committed the crime was Conner's testimony. He asserts that Conner could not have made a positive identification where he could only see the upper part of defendant's face, Conner only briefly viewed defendant, and Conner's degree of attention was insufficient as belied by the lack of detail regarding defendant's physical description. Defendant also claims Conner was severely impeached by the defense witnesses who testified that Conner did not see the shooter's face and that the shooter wore a full, rather than half, ski mask.

¶ 22    As defendant notes, Illinois courts consider five factors, commonly known as the *Biggers* factors, when determining whether a witness's identification is reliable. *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). These include (1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of the witness's earlier description of the offender, (4) the level of certainty shown by the witness when confronting the alleged offender, and (5) the length of time between the offense and the identification confrontation. *Biggers*, 409 U.S. at 199-200; *Slim*, 127 Ill. 2d at 307-08. In addition to these specific factors, courts also consider the totality of the circumstances when reviewing the reliability of an identification. *People v. Smith*, 299 Ill. App. 3d 1056, 1062 (1998). Identifications are usually based on overall impressions rather than on specific features. *Slim*, 127 Ill. 2d at 309.

¶ 23    While the evidence in this case was certainly not overwhelming, examining it in a light most favorable to the prosecution, as we must, we conclude that a rational fact finder could have found beyond a reasonable doubt that it was defendant who shot Brown dead. See *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007) (a reviewing court must give the State the benefit of all reasonable inferences). As to identification, the evidence shows that Conner had ample opportunity to view defendant because Conner was standing only several houses down and

across the street from where defendant stood, as reflected in the State's photo exhibits. Defendant was facing Conner when he pulled out a revolver. Conner then saw Brown beg for his life before defendant shot him in the chest. Defendant walked toward a car, only to return again and shoot Brown in the upper body. Conner had yet another unobstructed view of defendant as he drove past Conner's house. Conner could see defendant's upper body and the upper half of his face, including his eyes, forehead, and hair. Conner's description of the shooting was consistent with the medical examiner's evidence and also the forensic evidence showing no cartridge cases were ejected, which was consistent with his observation that the weapon was a revolver. Conner's degree of attention was high, as he rather immediately saw that defendant was carrying a revolver.[2]

¶ 24    While Conner did not previously know defendant, he described defendant in detail as an African-American male with long dreads, half pinned back, and who was wearing black jogging pants, and a gray hoodie bearing black writing with the hood hanging down. Defendant was wearing a half-ski mask. The physical description of defendant's hair and outfit was even largely consistent with the defense witness, Woods, and also defendant's arrest photographs showing him to have long dreads. Conner testified competently and consistently when identifying defendant as the shooter from the photo array, lineup, and also in court. Defendant concedes the length of time between the identification and crime was about three months, which arguably sways in the prosecution's favor.

¶ 25    The State also presented circumstantial evidence supportive of Conner's identification. Defendant's girlfriend testified that he was shot around the same time on March 21, 2012, and she likewise heard two gunshots, a pause for a minute, and then more gunshots. She also saw Brown's car driving towards Halsted Street after the shooting. Parker testified that some 10 days before the shooting, defendant located Brown at Parker's house, then drove past Brown's girlfriend's house, and later threatened Brown with a gun.

¶ 26    Although Woods, the defense witness, testified that the shooter wore a hood and full ski mask, she also testified that she believed she would be carjacked and "so looking at his face is something that I just blacked out." Likewise, although Conner's teacher stated he did not see the shooter's face, Conner testified that he did. The jury apparently chose to believe Conner over the defense witnesses and resolved any inherent contradictions when weighing the evidence, and we are not at liberty to disturb its determination. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (defendant's conviction will not be reversed simply because the evidence is contradictory or because defendant claims a witness was not credible); *People v. Berberena*, 265 Ill. App. 3d 1033, 1048 (1994) (where the evidence is conflicting, it's the jury's role to determine the credibility of witnesses).

---

[2]Defendant argues that Conner's degree of attention was suspect given that Conner was apparently more focused on the weapon than the offender. Defendant cites "weapons focus" as a problem that some experts believe diminishes the reliability of an identification. Defendant fails to cite any Illinois cases on point to support this argument, and regardless, he failed to develop a record in the trial court to support this specific theory. See *People v. Wigman*, 2012 IL App (2d) 100736, ¶ 36 (stating reviewing courts will not take cognizance of arguments in parties' briefs that are not properly supported by the record before the trial court); *People v. Reatherford*, 345 Ill. App. 3d 327, 340 (2003) (this court is not bound to follow decisions from foreign jurisdictions).

¶ 27    We thus reject defendant's contention that Conner's description was too vague or uncertain simply because Conner failed to identify defendant's height, age, or weight. This is because the "credibility of an identification does not rest upon the type of facial description or other physical features which the complaining witness is able to relate," but rather, it depends on "whether the witness had a full and adequate opportunity to observe the defendant." (Internal quotation marks omitted.) *People v. Robinson*, 206 Ill. App. 3d 1046, 1051 (1990). As set forth above, Conner had just that. See *Slim*, 127 Ill. 2d at 308 (a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification). Defendant's sufficiency of the evidence claim therefore must fail.

¶ 28    Defendant next contends the State improperly introduced the "demonstrative" exhibit depicting defendant wearing a "half-ski mask" during its rebuttal argument without having introduced this exhibit at trial. In fact, as discussed, the State's exhibit showed a black half-circle superimposed over the lower portion of defendant's face in his arrest mug shot and cannot be described as a graphic representation of a mask. Defendant contends the trial court's denial of defense counsel's motion for a mistrial on the basis of introducing this exhibit during rebuttal closing argument constitutes reversible error.

¶ 29    The propriety of declaring a mistrial is within the discretion of the trial court.[3] *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). Generally, a mistrial should be declared only when some trial occurrence is of such a character and magnitude that it deprives the party seeking mistrial of a fair trial. *People v. Redd*, 135 Ill. 2d 252, 323 (1990). Mistrial, for example, is warranted when the jury is apparently so influenced and prejudiced that it could not have been fair and impartial, and the damage could not be cured by admonitions and instructions. *People v. Clark*, 231 Ill. App. 3d 571, 574-75 (1992). Thus, for a reversal following the denial of a motion for a mistrial, the appellant must show prejudice from the introduction of the incompetent evidence at issue and also that the resulting damage could not be remedied by the court's admonitions and instructions. *People v. Alvarez*, 186 Ill. App. 3d 541, 549 (1989); *People v. Williams*, 137 Ill. App. 3d 736, 744 (1985). However, mistrial in a criminal prosecution should only be granted with the greatest caution, under urgent circumstances and for very plain and obvious causes. *People v. Dotson*, 143 Ill. App. 3d 135, 146 (1986). Because defendant properly preserved his claim of error, warranting a harmless-error analysis, the State maintains the

---

[3]On appeal, in defendant's "issues presented" section of his brief, he asserts we should apply a *de novo* standard of review to the matter involving admission of the altered photo during rebuttal argument. In support, defendant cites *Wheeler*, 226 Ill. 2d at 121, where the supreme court noted that whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue that requires *de novo* review. Subsequent appellate court cases have noted the apparent conflict, where *Wheeler* calls for a *de novo* standard and yet another supreme court case calls for an abuse of discretion. See *People v. Hayes*, 409 Ill. App. 3d 612, 624 (2011). Regardless, we find *Wheeler* inapplicable. *Wheeler* addressed inflammatory and prejudicial statements by a prosecutor during closing argument rather than the case we have before us, which involved the State's introduction during rebuttal argument of a photographic exhibit that was not entered into evidence at trial and the defense's subsequent motion for a mistrial based on the improper exhibit. As defendant argues error based on both an improper evidentiary presentation and also based on improper denial of mistrial, we apply the familiar abuse of discretion standard of review. We nonetheless note that under either a *de novo* or abuse of discretion standard, we would reach the same conclusion based on the prejudice that resulted in this closely balanced case.

burden of persuasion with respect to prejudice. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). For the reasons to follow, the State has failed to maintain that burden in this case.

¶ 30       Defendant specifically argues the altered mug shot was inadmissible in the first place as a demonstrative exhibit because it did not depict the "physical facts as they actually existed at the time of the crime" and the display was at the heart of this identification case. Defendant argues that even assuming the altered mug shot was admissible, the State failed to properly tender it to the defense prior to trial or lay a foundation for its introduction during trial, instead springing the surprise exhibit on the jury during rebuttal argument. He argues he was deprived of the opportunity to object to the exhibit, move for its exclusion prior to trial, or prepare a counterdemonstrative exhibit depicting defendant wearing full ski mask. Defendant thus asserts the introduction of the exhibit was prejudicial error which could not be cured with any remedial instruction.

¶ 31       The State responds that the State's conduct was not improper because the altered mug shot accurately reflected Conner's testimony that defendant wore a half-ski mask during the shooting and, moreover, was used as invited comment, in response to defense counsel's closing argument. While the State concedes the altered mug shot was never introduced into evidence at trial, it asserts that the unaltered mug shot was admitted without objection and also argues that the court's instructions were curative of any error.

¶ 32       We note that demonstrative evidence has no probative value in itself but rather serves as a visual aid to the jury in comprehending the verbal testimony of a witness. *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341-42 (1991). The overriding considerations in admitting demonstrative evidence are relevancy and fairness. *People v. Burrows*, 148 Ill. 2d 196, 252 (1992). Thus, before a demonstrative exhibit like the present one can be introduced, a foundation must be laid, by a knowledgeable witness, that it accurately depicts and portrays what it purports to show. See *Cisarik*, 144 Ill. 2d at 342; see also *People v. Bryant*, 202 Ill. App. 3d 1057, 1064 (1990) (an accurate photograph is one which is identified by a witness as a portrayal of certain facts relevant to an issue and is verified by the witness on personal knowledge to be a correct representation of these facts). In addition, the exhibit is only admissible if its probative value is not substantially outweighed by the danger of unfair prejudice. See *Cisarik*, 144 Ill. 2d at 342. As with a motion for a mistrial, the question of admissibility of such exhibits is a matter within the trial court's discretion. *Burrows*, 148 Ill. 2d at 252.

¶ 33       We agree with defendant that it was error for the State to introduce a demonstrative exhibit during its rebuttal argument without having produced the exhibit to the defense and without laying any sort of foundation for its use during the trial. While the State and the court found the exhibit to be consistent with Conner's testimony as to the half-ski mask, we question the wisdom of that conclusion, as it strains credulity that any ski mask could possibly look like a blacked-out half-circle over an individual's face. As set forth above, there is no indication that Conner reviewed any photographic or graphic images of defendant wearing a ski mask in 2012, when he identified defendant as the shooter to police. At trial, the State did not introduce any mask into evidence or ask Conner to testify about the altered mug shot, let alone defendant's unaltered mug shot.

¶ 34       Moreover, we cannot say that Conner would have testified that the altered mug shot, apparently created some two years after the 2012 shooting, reflected how the half-ski mask looked or how defendant looked while wearing the half-ski mask when the crime occurred.

Conner testified that defendant had his hair half pulled back and a hoodie on at the time of the shooting. In the arrest photo, by contrast, defendant's dreadlocks are down, and he's wearing a white v-neck T-shirt. See *People v. Crowe*, 390 Ill. 294, 303-04 (1945) (error to admit photo that merely supports the plaintiff's theory but does not show the physical facts as they actually existed at the time of the crime); *cf. People v. Sanchez*, 115 Ill. 2d 238, 268 (1986) (distinguishing *Crowe* and finding no prejudice in admitting magnified photos of actual items of physical evidence obtained from the crime scene). It was unfair to present this doctored exhibit because it arguably preconditioned the jury to accept the State's theory without any foundational support. See *French v. City of Springfield*, 65 Ill. 2d 74, 82 (1976). The State thus deprived the defense of questioning the accuracy of the image, moving to exclude it or forcing the State to create the image to the defense's satisfaction, cross-examining Conner regarding the image, and likewise presenting a counterimage of a full ski mask. *Cf. Bryant*, 202 Ill. App. 3d at 1065-66 (noting photos that were taken at the behest of law enforcement several days after the burglary and which portrayed the victim's house at time of the crime were properly presented to the jury, where the victim testified on direct that they were accurate representations of the crime scene and the defense cross-examined her on the conditions under which the photos were taken).

¶ 35 We find *People v. Wolf*, 178 Ill. App. 3d 1064, 1067 (1989), instructive. There, a key State's witness testified that defendant admitted committing residential burglary by throwing a brick through the victim's window, although defense witnesses testified they had not found any such brick. During rebuttal closing arguments, the prosecutor placed a brick on his counsel table. The trial court denied defense counsel's motion for a mistrial and admonished the jury that the brick was not evidence and should be disregarded. This court noted that the brick was not admitted into evidence and found the displaying of the brick was highly prejudicial given that it was at the heart of the case and presented just before the jury's deliberation. This court determined the trial court's instructions could not cure the prejudice and the error was not harmless beyond a reasonable doubt.

¶ 36 We similarly conclude that the display and argumentative use of the altered mug shot was prejudicial. The image was central to this prosecution, which revolved almost entirely around the accuracy of Conner's identification of defendant as the shooter. Here, the evidence was closely balanced, as there was no physical evidence linking defendant to the crime, and 13-year-old Conner was the only eyewitness to the shooting. Conner's testimony, while competent, was impeached by the State's own police reports indicating the shooter wore a full ski mask with velcro and the defense's two witnesses. See *Piatkowski*, 225 Ill. 2d at 570-71 (identifying closely balanced cases); *People v. Starks*, 2014 IL App (1st) 121169, ¶ 66 (same). The closely-balanced nature of the evidence made the error especially harmful. In addition, the side-by-side presentation to the jury of the altered mug shot, introduced absent any evidentiary foundation, with the exact same properly admitted mug shot immeasurably enhanced the prejudice. The jury was then forced to compare how defendant appeared wearing the supposed ski mask to how he looked without it, not on the day of the crime but the day of his arrest, thus boosting the credibility of the State's main witness. Furthermore, the judge did not instruct the jury to disregard the altered photo but rather emphasized it *was* demonstrative, making this case arguably more prejudicial than *Wolf*, cited above. Putting the trial court's instruction aside, it is difficult to conceive of *any* instruction that would be curative of this rebuttal sucker punch. Based on the totality of the circumstances, the State failed to maintain its burden of

proving the error was harmless beyond a reasonable doubt, and the court abused its discretion in both allowing the State to utilize the undisclosed demonstrative exhibit in rebuttal and also in denying defense counsel's motion for a mistrial. See *Thurow*, 203 Ill. 2d at 363 (noting in a harmless error analysis, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error).

¶ 37    In reaching this conclusion, we find the State's argument that the use of the exhibit was "invited" comment on rebuttal is palpably offensive, as this specific argument was surely expected given the defense theory of the case, announced in opening statement, as being all "about identification" and that "no one could have actually seen the face of the person who shot Ricky Brown." Almost all of the evidence related to the identification issue. If such an argument was unanticipated, the State would have had no opportunity to spring this doctored exhibit on the court because they would not have been on notice. Instead, it is clear that the prosecution knew the defense would focus on the eyewitness identification, so they prepared this exhibit ahead of time and displayed it without disclosing it and without ever laying a foundation for it. This patently improper tactic would surely be highly prejudicial to defendant's right to a fair trial. The gravity of the error resulted in a denial of fundamental fairness. See *Nelson*, 235 Ill. 2d at 435.

¶ 38    While we reverse and remand for a new trial on the basis of the improper admission of the altered arrest photo, because we find the evidence was sufficient to convict defendant beyond a reasonable doubt, there are no double jeopardy concerns in remanding the case for a new trial. See *Piatkowski*, 225 Ill. 2d at 566-67.

¶ 39    Defendant raises a number of other contentions on appeal, most of which will not likely recur on retrial. We would note, however, in regards to his claim that the State improperly attempted to repeatedly question witnesses in an effort to elicit hearsay statements, the trial court properly sustained objections to these questions, and the State should be mindful not to repeat the pattern upon retrial. See *People v. Larry*, 218 Ill. App. 3d 658, 663 (1991) (noting it is improper for a prosecutor to persist in repeating the same questions after objections have been sustained). We note likewise that defendant did not challenge on appeal the admission of Parker's testimony that defendant threatened the victim some 10 days before the shooting. To the extent that Parker testified the victim appeared nervous or agitated upon seeing defendant, those were not out-of-court statements or hearsay, contrary to defendant's suggestion, but proper and relevant testimony as to Parker's observations. See *People v. Jackson*, 250 Ill. App. 3d 192, 198 (1993) (a witness may testify that another person was scared if the fact is relevant); *People v. Peter*, 220 Ill. App. 3d 626, 630 (1991) (a nonexpert witness may summarize sensory perceptions or express an opinion based upon observation).

¶ 40                                          CONCLUSION

¶ 41    For the reasons stated, we reverse the judgment of the trial court and remand the cause for a new trial.

¶ 42    Reversed and remanded.

