2023 IL App (1st) 221362-U
Order filed: December 14, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1362

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 CR 03324 |
| | ) | |
| JULIUS HAMLIN, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Ocasio III concur in the judgment.

**ORDER**

¶ 1   *Held*: We reversed and remanded for a new trial because the trial court erred by considering new evidence during the State's closing argument that had not been previously introduced.

¶ 2   Following a bench trial, the trial court convicted defendant, Julius Hamlin, of aggravated battery with a firearm and aggravated discharge of a firearm for shooting Anthony Davis on February 6, 2021, in the parking lot outside Mid City Food & Liquor (Mid City). The court sentenced defendant to concurrent terms of six years' incarceration for the aggravated battery

conviction and four years' incarceration for the aggravated discharge conviction. On appeal, defendant contends that his right to be present at a critical stage of the trial was violated when the court viewed, in chambers, a video recording of the shooting and his electronically recorded interview with detectives. Defendant also contends that the court erred during the State's closing argument when it considered evidence that had not been admitted at trial. We reverse and remand for a new trial.

¶ 3    Prior to trial, defendant filed a motion pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), arguing that he shot Davis in self-defense and asking that the court allow him to admit evidence that Davis threatened him prior to the shooting. Specifically, defendant alleged that on December 19, 2020, he and Davis were at a family party. Davis is the cousin of Tameka Nelson, the mother of defendant's children. At the party, Davis got into a fight with a third person. Defendant broke up the fight and physically removed Davis from the scene. Davis became upset at defendant for intervening in the fight, and he vowed to retaliate and to "get his lick back," meaning that he would "do violence" to defendant.

¶ 4    On December 25, 2020, Davis was at a Christmas party with Nelson and he said to her, "Tell your baby's daddy *** I'm tryna not shoot him." Nelson subsequently warned defendant of what Davis had said to her.

¶ 5    Defendant further alleged that Davis had 15 prior arrests, "including convictions for weapons, drugs and other offenses."

¶ 6    Defendant asked that Davis's prior threats of violence be admitted at trial to show that Davis was the initial aggressor on the night of the shooting and also to show defendant's state of mind.

¶ 7 On March 23, 2022, the court held a hearing on defendant's *Lynch* motion. During the hearing, defense counsel reiterated the threats that Davis made to defendant on December 19, 2020, and December 25, 2020. Defense counsel referenced a video of the shooting that allegedly supported defendant's claim of self-defense. The video contained no audio recording, but allegedly showed defendant and Davis in line in Mid City just prior to the shooting. According to defense counsel, defendant would testify that while inside Mid City, Davis was threatening violence against him in retaliation for the altercation at the December 19 family party. Defendant would testify that he told Davis "what happened in December is done and over, leave me alone."

¶ 8 Defense counsel stated that the video shows defendant eventually leaving Mid City, followed by Davis. Defendant would testify that after leaving the store, Davis continued to threaten him, saying "You're not going anywhere," "I'm going to drop you right here," and "I'm getting my lick back." Scared that Davis would kill him, defendant punches Davis and they begin to struggle. Defendant slips and falls and Davis continues to hit him with "full force blows" while he is on the ground. Davis motions and yells for "his buddies" to aid in the fight. Defendant sees people running in his direction at Davis's request, and so defendant shoots Davis in self-defense. Defendant subsequently called 911 and reported the shooting and went to the hospital to be treated for his injuries.

¶ 9 In response, the State noted that the video contains no audio of the alleged threats made by Davis to defendant immediately prior to the shooting and that the video indicates that defendant was the initial aggressor when he punched Davis first. The following colloquy ensued:

"[The Court]: It is a video of the crime scene basically showing before the shooting occurred. They were in the store together. Then they went outside and had a fight and then the shooting occurred outside of the store?

-3-

[Assistant State's Attorney]: Yes, ma'am.

[The Court]: The entire video of the facts leading up to the shooting would come in to show the course of the conduct immediately prior to the shooting ***. Since there is no audio in the video and since the defendant was present during the incident, he certainly would be allowed to testify as to his version of what happened immediately prior to the shooting.

And since the video captures their interaction, it doesn't have any audio, but it does give a visual portrayal of what happened before the shooting. *** I think the entire video should be admitted as, again, setting forth the course of conduct or interaction between the parties immediately prior to the shooting.

It can come in under *Lynch*, but it can also come in because it captures the shooting and the parties' interaction immediately prior to the shooting. And it goes to the issue of who was the initial aggressor. It is clear that the State was arguing that the defendant was the initial aggressor. The defense is arguing that [Davis was] the initial aggressor. So that video in its entirety will be important for the trier of fact to make a determination as to who was, in fact, the initial aggressor."

¶ 10    The court also stated that a proper foundation would have to be laid at trial for the video to be admitted. The court further ruled that the alleged threats made by Davis to defendant on December 19 and December 25 were admissible.

¶ 11    The cause proceeded to a bench trial. During opening statement, defense counsel stated that the court would see the video of the shooting and of the moments leading up to the shooting, including the physical fight between defendant and Davis. Although the video contains no audiotape, defense counsel stated that the court would hear from defendant as to what was being

said, including the threats of violence made by Davis, which justified defendant's shooting of Davis in self-defense.

¶ 12    The video of the shooting, referenced by defense counsel, included 15 individual video files recorded from 12 different security cameras in Mid City and Mid City's parking lot. The video files were identified by "channel," with each channel representing a different camera. State's Exhibit 1 was a DVD containing the 15 individual video files from the 12 different security cameras. We will discuss the video files later in this order.

¶ 13    At trial, Davis testified that he could not remember whether he was at Mid City on the night of the shooting on February 6, 2021. The State asked Davis whether he had an opportunity to look at the footage contained in State's Exhibit 1. Davis said he had looked at the videos but that he could not say whether they truly and accurately depicted the events of February 6, 2021. Davis explained that he was so intoxicated on the night of the shooting that he has no memory thereof. Davis further testified that he does not know who shot him.

¶ 14    Detective Matt Hazlehurst testified that he was assigned to investigate the shooting at Mid City on February 6, 2021. When he arrived at the scene, he saw six spent shell casings in the parking lot, two bullet holes in the front entry door, a metal fragment inside the store, and some blood splatter behind the counter. Detective Hazlehurst subsequently spoke with Davis at the hospital. Davis could only recall that he had been shot following a physical altercation.

¶ 15    Detective Hazlehurst spoke with Mid City's owner-operator, Singh Lakhwinder, who showed him videos of the shooting from cameras on the interior and exterior of the store. Officers inventoried the videos.

¶ 16    Detective Hazlehurst testified that he and Detective Weathers conducted an electronically recorded interview (ERI) with defendant at the police station in the late hours of February 6, into

the morning of February 7. The officers gave defendant his *Miranda* warnings. Defendant stated that while inside Mid City, he saw Davis. Davis told defendant he wanted to get his lick back, meaning that he wanted to physically attack defendant. Defendant exited Mid City and Davis followed him while yelling "yo, yo" and gesturing toward other people. Defendant was in Davis's neighborhood and he feared that Davis was calling over people who might be armed. Defendant said he felt like his life was in danger and that he shot Davis in self-defense.

¶ 17   Detective Hazelhurst testified that on the date of the shooting, defendant had a valid concealed carry license and a valid FOID card.

¶ 18   The parties stipulated to "the foundation of the *** electronically recorded interview" of defendant conducted by Detectives Hazelhurst and Weathers on February 6 and 7, 2021. The court accepted the stipulation. The trial court did not view the ERI in open court, but instead viewed it in chambers the next day. We will discuss the court's procedure for viewing the ERI later in this order.

¶ 19   We have reviewed the ERI, which is contained in the record on appeal. During the interview with Detectives Hazelhurst and Weathers, defendant said he was inside Mid City buying liquor when Davis approached him. Davis said he wanted his lick back, meaning he wanted to fight defendant in retaliation for the altercation at the party on December 19. Defendant told Davis to go home and he walked out of the store.

¶ 20   Davis followed him outside into the parking lot and continued to say he wanted his lick back. Defendant said he had no "beef" with Davis and tried to walk away. Davis walked close to defendant and said "yo, yo" like he was calling for his friends to come help him fight defendant. Defendant knew he was in Davis's neighborhood and he turned around and faced Davis because he was afraid that Davis and his friends might attack him from behind. Defendant said he was

scared of Davis's threats and of the fact that he was calling for people to gang up on him. Defendant and Davis began to fight. Davis pulled a chain off defendant's neck. Defendant slipped on some ice and then shot Davis in self-defense.

¶ 21    After the court admitted the ERI, the State published a segment of video channel 10 from State's Exhibit 1, which is contained in the record on appeal. The published segment of channel 10  (which, as discussed, contains no audio) shows defendant and Davis standing near a vehicle in the parking lot outside of Mid City. First they are talking, then arguing.  Defendant throws the first punch and they begin physically fighting. Defendant slips to the ground. Davis appears to motion somebody over and a person runs toward them and swings at Davis. Defendant pulls out a gun and fires at Davis, who flees into Mid City. Defendant continues to fire into Mid City before walking away.

¶ 22    After viewing the channel 10 segment, the following colloquy ensued:

"[The Court]: Is there anything else you want me to see?

[Assistant State's Attorney]: Not from this video, no, Judge. I know that your Honor does have to leave, so we can continue—

[The Court]: Okay. If there are other videos that you want me to watch tomorrow, as I said, we have some free time on the call tomorrow, so even if the parties can't be here, if the parties are in agreement that I can watch some other videos in chambers, I will watch them if that will expedite things.

[Assistant State's Attorney]: Judge, what I'll do is I will get you copies of all of the video so that you can watch them at your leisure and we'll note the –

[The Court]: Just tell me which ones you want me to watch, where you want me to start and stop.

[Defense Counsel]: Yes, aside from the ERI we're asking that clip 11—they call it channel 11 but.

[The Court]: So, so far I've been given the details on two clips. One on channel 10, which was the one we watched, *** and then there was another one on channel 11 which I have not seen yet ***. If you are going to show me the one on channel 11, I can watch that tomorrow.

[Assistant State's Attorney]: Yes.

[The Court]: And then you also want me to watch the ERI video; is that correct?

[Defense Counsel]: Yes ***.

[The Court]: Are both parties in agreement that I should watch these videos in chambers tomorrow?

[Assistant State's Attorney]: Yes, Judge.

[The Court]: You have to state—

[Defense Counsel]: Oh, yes, your Honor."

¶ 23   On the next trial date, Curtis Wriddley testified that he worked the security shift at Mid City on February 6, 2021. Sometime during the evening, Davis walked into the store and greeted Wriddley. Davis subsequently began arguing with another customer; Wriddley asked Davis to take the argument outside the store. After Davis and the customer left the store, Wriddley stood at his usual post by the front door and then moved away from the door toward the lottery machine. Customers inside the store said that Davis and the other person were fighting. Wriddley walked back toward the front door to see what was happening, and he heard two gunshots. Davis then ran inside the store and hid behind the counter.

¶ 24    Wriddley testified that had reviewed State's Exhibit 1. The State played a segment of channel 11 in court. Wriddley identified himself on the video, standing by the front door. He also identified Davis and a man wearing a green and white jacket as the person to whom Davis spoke.

¶ 25    The court noted for the record that the video showed Davis talking to the man in the green and white jacket while he stood in line. The man left the store, followed by Davis. About two minutes later, everybody still inside the store began running. Davis ran back into the store.

¶ 26    Wriddley testified that he did not see the man in the green and white jacket in court.

¶ 27    After the State rested, defendant moved for a directed finding, arguing that his shooting of Davis was in self-defense. In response, the State replayed the segment of channel 10 that had been published earlier in court, and argued that it showed defendant, not Davis, was the aggressor. The court noted again that the video shows defendant throwing the first punch. In the course of the fight, though, defendant lands on the ground and Davis appears to be "getting the best" of him. Another person comes toward them, at which point defendant pulls out a gun.

¶ 28    The court denied defendant's motion for a directed finding.

¶ 29    Tameka Nelson testified she is defendant's girlfriend and the mother of his children. On December 19, 2020, she and defendant were at a party in Lombard. Nelson's cousin, Davis, was also there. A fight broke out among the guests, and defendant held Davis back to keep him from fighting. Davis became upset at defendant for holding him back and they "ended up getting into it with each other."

¶ 30    A few days later, Nelson was at another party when she again saw Davis, who said to her, "Tell your baby daddy I want my lick back." Nelson told him to "leave it alone." Davis responded that he was "trying not to shoot [defendant] but I want my lick back." Nelson later told defendant about Davis's threat.

¶ 31    On cross-examination, Nelson explained that when Davis said he wanted his "lick back," he was saying that he wanted revenge on defendant for their altercation at the party on December 19.

¶ 32    During closing arguments, the State replayed the published segment of the channel 10 video to show that defendant was the initial aggressor. The court agreed that the video showed defendant threw the first punch but then Davis waved somebody over who joined the fight against defendant. At that point, according to the court, defendant pulled out his gun.

¶ 33    The State argued that Davis was not waving someone over, but instead was raising his arm to strike defendant. The State also argued that the person who joined the fight came to assist defendant, not Davis, and that this person is seen on the video returning with defendant to defendant's automobile after the shooting.

¶ 34    The court stated, "I didn't see what car he came out of. I just saw him come and joining the fight against the defendant. So if you would like to play the portion of the video which you say shows the second person coming out of the car the defendant was in then you are free to do so."

¶ 35    The State offered to play channel 8 from State's Exhibit 1. The court asked, "Is channel 8 into evidence?" The State replied, "Yes. It is on [State's] Exhibit No. 1, which is all the videos regarding this incident." Defendant made no objection.

¶ 36    The State played channel 8 and asked that the record reflect that at the 10 minute-17 second mark of the video, it showed an individual exiting the last in a line of four vehicles. The State then played channel 10 and stated for the record that at the 10-minute, 42-second mark, the same individual is seen returning to the same vehicle with defendant and leaving the scene.

¶ 37    The court subsequently convicted defendant of aggravated battery with a firearm and aggravated discharge of a firearm. The court sentenced defendant to four years' imprisonment for

the aggravated discharge and six years' imprisonment for the aggravated battery, with the terms to run concurrently. Defendant appeals.

¶ 38    Defendant argues that his right to be present at a critical stage of the trial was violated when the court viewed the ERI and unpublished segments from channel 10 in chambers without him present. Defendant makes no argument with regard to the court's viewing of channel 11 in chambers.

¶ 39    Under the due process clause of the fourteenth amendment (U.S. Const., amend. XIV, § 1) and article 1, section 8 of the Illinois constitution (Ill. Const. 1970, art. I, § 8), a criminal defendant has the right to be present at all critical stages of the proceedings against him, from arraignment to sentencing, if his presence would contribute to the fairness of the proceeding. *People v. Lucas*, 2019 IL App (1st) 160501, ¶ 12; *People v. Lindsey*, 201 Ill. 2d 45, 57 (2002). Defendant's right to be present is not violated when his presence " 'would be useless, or the benefit but a shadow.'" *People v. Lofton*, 194 Ill. 2d 40, 67 (2000) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07(1934)). In other words, "a defendant has the right to be present whenever his or her presence bears a reasonably substantial relationship to having a full opportunity to defend against the charges." *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶ 102.  Defendant's constitutional rights are violated only if his absence caused the proceedings to be unfair or resulted in the denial of an underlying substantial right, such as the right to confront witnesses, the right to present a defense, and the right to an impartial jury. *Lindsey*, 201 Ill. 2d at 57.

¶ 40    Whether defendant's absence affected the trial's fairness depends on an assessment of the entire record. *Lucas*, 2019 IL App (1st) 160501, ¶ 13. Our review is *de novo*. *Id.*

¶ 41    The State argues that defendant waived review of this issue when his defense counsel stated for the record that he agreed that the court should watch the ERI and the unpublished segments

from channel 10 in chambers, outside the presence of the parties. We disagree. Initially, we note that defense counsel only agreed for the court to view the ERI and chapter 11 in chambers; he did not agree for the court to view channel 10 in chambers. Thus, the State's argument that defense counsel waived defendant's right to be present during any private viewing of channel 10 is without merit. Accordingly, we will confine our discussion of the State's waiver argument to whether defense counsel's acquiescence in the court's private viewing of the ERI waived defendant's right to be present.

¶ 42    A defendant's attorney has no power to waive his client's right to be present at a critical stage of the proceedings; rather, the waiver must be made by defendant himself. *Id.* ¶ 14. Defendant's waiver of his right to be present must be an intentional relinquishment of a known right (*People v. Bartels*, 2022 IL App (3d) 190635, ¶ 21), but in the instant case, the right to be present was not made known to defendant. The record reflects that the trial court asked the parties in the middle of trial whether they agreed that it should watch the ERI in chambers the next day. Both the State and defense counsel said yes. However, neither the trial court nor defense counsel informed defendant of his right to be present for the viewing, even though this court has found that the viewing of evidence in chambers is a critical stage of the proceeding for which defendant had the due process right to be present. *Lucas*, 2019 IL App (1st) 160501, ¶ 15.  Because defendant was not made aware of the right, he could not knowingly and voluntarily waive it. *Id.* ¶ 14; *People v. Flagg[1]*, 2021 IL App (1st) 191692-U, ¶ 50 (defendant did not knowingly waive his right to be

---

[1] Rule 23( e) states that a "nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes." Ill. S. Ct. R. 23 (e) (eff. Feb. 1, 2023)

present during the viewing of evidence in chambers, where the trial court never explained the right to him).

¶ 43    For the same reason, we also reject the State's argument that defendant is estopped, under the invited error doctrine, from raising the argument that the trial court violated his right to be present when it viewed the ERI in chambers without him. Under the invited error doctrine, a defendant may not request to proceed in one manner at trial and then later contend on appeal that the course of action was erroneous. *People v. Carter*, 208 Ill. 2d 309, 319 (2003).  A defendant's agreement in the direction of the proceedings that he later challenges on appeal goes beyond mere waiver and is estopped. *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 147. As we have discussed, though, defendant here could only agree to waive his right to be present during the court's viewing of the ERI if he first was made aware of that right, so that the waiver was knowing and voluntary; counsel could not waive the right for him. In the instant case, defendant was not made so aware, either by the trial court or by defense counsel, of his right to be present during the viewing of the ERI, and thus he never knowingly and voluntarily agreed for the court to view the ERI in chambers without him. As defendant never knowingly and voluntarily agreed to, or invited, the trial court's viewing of the ERI in chambers outside his presence, he is not estopped under the invited error doctrine from arguing that the court violated his right to be present during the viewing.

¶ 44    The State cites the Fourth District Appellate Court's opinion in *People v. Aquisto*, 2022 IL App (4th) 200081, which effectively held that when the trial court views a video in chambers after it already has been admitted into evidence, defense counsel can waive the defendant's presence because such a viewing is not a critical stage of defendant's trial. *Id.* ¶¶ 81-83. The *Aquisto* court stated: "the defendant's presence in chambers as the judge reviewed an admitted video would not

have contributed to the defendant's ability to mount a defense any more than if the defendant were present in chambers as the judge reviewed documentary evidence." *Id.* ¶ 81.

¶ 45    The State here contends that the ERI reviewed in chambers already had been admitted and, as such, the review was not a critical stage for which defendant had a right to be present. Therefore, defendant was bound by his counsel's waiver.

¶ 46    However, in *People v. Villa*, 2023 IL App (1st) 210352-U, the First District Appellate Court disagreed with *Aquisto*, finding that the review of videos in chambers is a critical stage regardless of whether the videos already had been admitted. The *Villa* court stated:

"The trier of fact, whether court or jury, can review documentary evidence, or indeed any other evidence, during deliberations. Concern arises when the trier of fact *only* views or listens to evidence in private so that it is not seen or heard in open court by the defendant. Publishing evidence such as video and audio recordings in open court at trial serves the purpose of ensuring that the defendant has seen and heard all the evidence so that he or she may contribute to the defense and make an informed decision whether to testify." (Emphasis in the original.). Id. ¶ 66.

¶ 47    We agree with *Villa*. In the instant case, the trial court's review of the ERI was a critical stage. Defendant had a right to be present that could not be waived by counsel.

¶ 48    Having found no waiver or invited error, we proceed to address defendant's argument that he was denied his right to be present during a critical stage of trial. Defendant contends that *Lucas*, 2019 IL App (1st) 160501, is instructive. *Lucas* involved a traffic stop and subsequent convictions for driving under the influence of alcohol, misdemeanor battery, misdemeanor resisting a peace officer, operating an unsafe vehicle, and negligent driving. *Id.* ¶ 1, ¶ 4. During the bench trial, the court viewed a video of defendant's traffic stop in chambers, outside her presence. *Id.* ¶ 1.

¶ 49    On appeal, Lucas argued she was denied due process by not being present during the trial court's viewing of the video of her traffic stop. *Id.* ¶ 10. We agreed, finding that Lucas's absence from the viewing of the video affected the fairness of the trial because she was unable to view all the evidence against her and aid in her own defense. *Id.* ¶ 14. We noted that the video of the traffic stop constituted a significant portion of the evidence against Lucas and that the court had relied on the video when finding her guilty. *Id.* ¶ 15. As nothing in the record indicated that Lucas had ever seen the video, and because the trial court did not allow her to be present during the viewing in chambers, we determined that she was not afforded the opportunity to confront the evidence against her and aid in her defense. *Id.* ¶ 14, ¶ 16. We particularly noted that as Lucas never saw the video and thus was not aware of all of the State's evidence against her, she was unable to make an informed decision about whether to testify. *Id.* ¶ 19.

¶ 50    Defendant contends that, similarly to *Lucas*, he was not made aware of all the evidence when deciding whether to testify. Specifically, defendant argues that segments of channel 10 that were potentially relevant to his defense were unpublished in open court and instead viewed only in chambers. These unpublished segments depict men with guns in the parking lot. One man flashes a gun while walking into Mid City. Another man gets out of an automobile after the fight and appears to consider following defendant. Defendant contends these unpublished segments of channel 10, which were viewed only in chambers, would have bolstered his claim of self-defense by showing that he reasonably felt in fear of his life at the time of the shooting because he was in Davis's neighborhood and believed that Davis was calling over dangerous associates to aid in the fight. Defendant argues there is no indication in the record that he ever saw these unpublished segments of channel 10, so he was unable to discuss them with his counsel and thereby aid in his defense. Nor was defendant able to make an informed decision about whether to testify, in the

absence of an awareness of all the evidence surrounding the shooting. Pursuant to *Lucas*, defendant contends that the trial court denied him the right to be present during a critical stage of the trial when it considered the unpublished segments of channel 10 in chambers, and he asks us to reverse and remand for a new trial.

¶ 51 Defendant's argument is unavailing because the record shows that the trial court never considered the unpublished segments of channel 10 in chambers. After the State published the segment of channel 10 depicting the shooting, the court asked, "Is there anything else you want me to see?" The State replied, "Not from this video, no, Judge." The court then asked the parties which videos they wanted her to watch in chambers the next day. Defense counsel asked her to watch the ERI and channel 11; he *never* asked the court to view any other segments of channel 10. After defense counsel made the request for the court to view the ERI and channel 11, the court said "so, so far I've been given the details on two clips. One on channel 10, which was the one we watched, *** and then there was another one on channel 11 which I have not seen yet ***. If you are going to show me the one on channel 11, I can watch that tomorrow." The Assistant State's Attorney said "yes." The court then said, "And then you also want me to watch the ERI video; is that correct?" Defense counsel said yes. The court asked the parties if they were both in agreement that it should watch "these videos in chambers tomorrow?" Both the State and defense counsel replied yes.

¶ 52 On this record, the court was stating that it already had viewed the published segment of channel 10 and it was asking the parties which additional videos they wanted it to view the next day in chambers. The parties responded that they wanted the court to view channel 11 and the ERI; the State specifically said there was nothing else on channel 10 that it wanted the court to review. No request was made that the court consider the unpublished segments of channel 10 at issue here

and there is no indication in the record that the court viewed anything other than the ERI and channel 11 in chambers, as requested. A segment of channel 11 was published on the next trial date during Wriddley's testimony.

¶ 53    As the trial court never viewed the unpublished segment of channel 10 in chambers, defendant's argument that the court violated his right to be present during the viewing fails.

¶ 54    Defendant next argues that the trial court denied him the right to be present when it viewed the ERI in chambers without him. We find no constitutional error. *People v. Ortiz*, 2023 IL App (1st) 211307-U is informative. Ortiz argued that the trial court violated his due process rights by watching an ERI in chambers without informing him of the right to be present. *Id.* ¶ 68. Ortiz relied on *Lucas*, where we reversed the defendant's convictions because her absence from the viewing of the video of the traffic stop in chambers affected the trial's fairness because she was unable to view the evidence and aid in her defense. *Id.* ¶ 75 (citing *Lucas*, 2019 IL App (1st) 160501, ¶ 14.). In so holding, the *Lucas* court emphasized that it was not sufficient that defendant knew of the existence of the video, rather, she needed to know the video's contents. *Id.* (citing *Lucas*, 2019 IL App (1st) 160501, ¶ 20).

¶ 55    The *Ortiz* court found *Lucas* distinguishable because Ortiz participated in the interview and thus knew firsthand of the ERI's contents. *Id.* ¶ 76. In contrast, the video in *Lucas* captured the interaction between the defendant and the officer from a point of view not shared by the defendant. *Id.* The *Ortiz* court determined that the circumstances of the case before it showed that Ortiz's absence while the court viewed the ERI was not a violation of his constitutional rights because he was aware of all the evidence against him and his presence during the viewing would not have contributed to the fairness of the procedure. *Id.*

¶ 56    Similarly, defendant here obviously participated in the interview with Detective Hazelhurst and Detective Weathers and thus knew firsthand of the ERI's contents. Defendant contends he was sleepy during the interview and would be "hard-pressed to remember the details of the conversation." Yet he points to no portion of the ERI that is in any way surprising to him or that he specifically forgot. Defendant also was present at trial during his counsel's cross-examination of Detective Hazelhurst about the ERI, and he makes no argument that the cross-examination was in any way circumscribed or limited by his failure to be present during the viewing of the ERI in chambers. On this record, the court's viewing of the ERI in chambers was not a violation of defendant's constitutional rights. Defendant already was aware of the ERI's contents and he has not shown how his absence from the viewing caused the proceedings to be unfair or resulted in the denial of an underlying substantial right such as the right to confront witnesses or present a defense.

¶ 57    Next, defendant contends that the trial court erred during the State's closing argument, when it allowed the State to introduce new evidence that had not been presented during the trial. Specifically, during closing argument, the State argued that defendant was the aggressor and in support it replayed the segment of channel 10 previously published during the trial, showing the fight in the parking lot leading to the shooting. The court agreed that the video showed defendant throwing the first punch, but also noted that the video showed someone joining Davis in the fight against defendant. The State countered that Davis was not waving anyone over but was merely raising his arm to strike defendant and that the person who joined the fight was an ally of defendant who exited defendant's vehicle and then returned to it following the shooting. When the court stated that it could not tell which vehicle the person exited from, the State offered to play channel 8. The court questioned whether channel 8 was in evidence, and the State responded affirmatively. The State then played channel 8 at the 10-minute, 17-second mark to show the person exiting

defendant's vehicle. The court subsequently convicted defendant of aggravated battery with a firearm and aggravated discharge of a firearm.

¶ 58    Defendant contends that channel 8 was never admitted into evidence or published to the court during trial and, as such, that is was error for the court to consider it for the first time during closing arguments. See *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 47 (the permissible scope of closing argument is limited to matters in evidence or admitted or controverted). Defendant forfeited review by failing to object to the introduction and viewing of the channel 8 segment during closing arguments. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, defendant asks that we review for first-prong plain error. On first-prong plain error review, defendant may obtain relief for a forfeited error if the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 64.

¶ 59    The State argues that no error was committed here because channel 8 was one of the videos on State's Exhibit 1 that was admitted into evidence at trial and properly before the court. The State contends that as channel 8 had been admitted at trial, it was not new evidence outside the scope of closing arguments; rather it constituted part of the trial evidence that could be argued and viewed by the court. See *Ferrer v. Vecchione*, 98 Ill. App. 2d 467, 474 (1968) (counsel may argue the evidence presented but may not supply new facts during closing arguments).

¶ 60    Contrary to the State's argument, the record shows that channel 8 was never admitted into evidence or published to the court during trial. During the pretrial hearing on defendant's *Lynch* motion, the trial court stated that assuming a proper foundation was laid at trial, "the entire video of the facts leading up to the shooting would come in." During trial, the parties stipulated to the authenticity and chain of custody of States' Exhibit 1, which contained 15 individual video channels recorded from 12 different security cameras in Mid City and Mid City's parking lot. The

court accepted the stipulation. However, neither party formally sought admission of State's Exhibit 1, containing all 15 video channels including channel 8 at issue here, nor did the trial court ever state for the record that it was admitting State's Exhibit 1.

¶ 61    Rather than seeking admission of all 15 video channels contained in State's Exhibit 1, the State published a segment of channel 10 to the court in support of its theory that defendant was the aggressor. Following publication of the channel 10 segment, the State and defense counsel agreed that the trial court also could consider channel 11 and the ERI in chambers. On the next trial date, the State published a segment of channel 11 when examining Wriddley. No other video channels from State's Exhibit 1 were offered into evidence or published to the trial court.

¶ 62    The first time the trial court viewed a segment of channel 8 was during the State's closing arguments when, as discussed above, the assistant State's Attorney played the segment in response to the court's inquiry as to whether Davis had called someone over to aid him in the fight. As channel 8 had never before been admitted into evidence or otherwise been published or even referenced during trial, it was not a proper subject for closing arguments nor could it properly be admitted and considered for the first time during closing arguments. See *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 28 (holding that it was error for the State to introduce an exhibit during closing argument without first having introduced it at trial, calling the first-time introduction of the exhibit during closing argument a "sucker punch" that prevented the defense from questioning the accuracy of the exhibit at trial or cross-examining a witness about the exhibit).

¶ 63    The State argues that even if it erred by playing the channel 8 segment for the court for the first time during closing arguments, there was no first-prong plain error because the evidence was not closely balanced. We disagree. Prior to the viewing of the channel 8 segment,  the trial court indicated that the evidence at trial, including channels 10 and 11, was closely balanced as to

whether or not defendant was acting in self-defense. Only after viewing the channel 8 segment did the court reject the self-defense argument and convict defendant. On this record, the improper introduction and viewing of the channel 8 segment for the first time during the State's closing argument tipped the scales of justice against him in a closely balanced case and constituted first-prong plain error. Accordingly, we reverse defendant's convictions and sentences and remand for a new trial.

¶ 64    As the evidence at trial was sufficient to show defendant's guilt beyond a reasonable doubt of aggravated battery with a firearm and aggravated discharge of a firearm, his retrial on these charges presents no double jeopardy impediment. This finding is only for purposes of double jeopardy, and we reach no conclusions as to defendant's guilt that are binding on retrial. *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008).

¶ 65    Reversed and remanded.